JOSEPH FARES, Respondent, v. THE RIO GRANDE WESTERN RAILWAY COMPANY, a Corporation, Appellant.

No. 1560.    (77 Pac. 230.)

1. **Railroads: Adjoining Highway: Negligence: Evidence.**
   Plaintiff, driving along a highway, approached where it ran parallel with a railroad track through a canyon for several hundred feet, and saw an engine, at a tank in the canyon, headed in the direction plaintiff was driving. Plaintiff started to drive along the highway through the canyon, when the engine without warning, and making no more noise than usual or necessary, backed toward him, and on its approach he was injured by his horses becoming frightened. *Held*, that there was no evidence of negligence on the part of the railway company.

**6. Same: Failure to give Warning.**

Plaintiff having testified that the engine was in plain view, and that he saw it when it started, and that the sounding of the bell or whistle might have added to the fright of his horses, no negligence was shown in the failure to give warning.

**2. Same: Construction of Track.**

A railway company has a right to construct its track through a canyon, though it is compelled in doing so to run parallel with and in close proximity to a highway.

**3. Same: Negligence: Proof: Assumption.**

Where plaintiff, suing for personal injuries, alleged that a railroad company was negligent in the construction and operation of its railroad so close to a highway that a team could not pass in safety, but offered no proof to sustain the allegations, it will be assumed that the railroad was lawfully constructed at such point.

**4. Same: Liability to Travelers.**

A railroad company having a track adjoining a highway is not responsible to travelers whose horses become frightened by the appearance of its engines or trains, if the same are operated prudently, and without unnecessary noise or willful disregard of a traveller's perilous position, after it has been discovered by the servants of the company.

**5. Same: Lookout.**

A railroad company is not required to keep a lookout specially for travelers on a highway running parallel with and in close proximity to the railroad track, nor to keep its trains so under control that they can be stopped if a team is found at a point of danger on such highway, nor to exercise the same degree of care as is required at grade crossings.

**7. Same: Operation: Negligence.**

A railroad company has the right to operate its road in a lawful manner, and, when it does so without negligence and without malice, it is not responsible for injuries occasioned thereby.

BASKIN, C. J., dissenting.

(Decided June 28, 1904.)

Appeal from the Third District Court, Salt Lake County.—*Hon. S. W. Stewart,* Judge.

Action to recover damages for personal injuries alleged to have been caused by the negligence of the defendant. From a judgment in favor of the plaintiff, the defendant appealed.

REVERSED.

*Messrs. Sutherland, Van Cott & Allison* for appellant.

*Messrs. Powers, Straup & Lippman* for respondent.

### STATEMENT OF FACTS.

This is an action to recover damages for physical injuries which the plaintiff claims he received because of the negligence of the defendant. The essential allegations of the complaint are, substantially, that the defendant is operating a railroad between Salt Lake City and Park City, through Parley's Canyon, which extends east and west; that, at a point about 300 feet west of the company's water tank in the canyon, the public highway runs parallel with and adjoins the railroad, the railroad being on the south side and a cliff of rocks on the north side of the highway, leaving insufficient space to drive a team along the highway with safety while an engine is being operated on the railroad track; that because of the close proximity of the highway to the railroad it was the duty of the defendant, in operating its engine or cars, to give timely warning of the approach of its engine and cars at that point, and to keep a lookout for teams that might be traveling along the highway, and keep its engine under control, so it "could be stopped if any team was at that point on the highway;" that "when its engine stopped at the water tank it was its duty to look ahead and allow any passing teams to reach a safe place, and to blow the whistle and ring the bell before starting, and, in running its engines westward, to keep a lookout for

passing teams, and stop should any be passing that point, and to approach said point with due care, and in such a manner that the engines could be readily stopped;"and that "on September 16, 1901, notwithstanding the defendant's knowledge of the danger, it failed in its duty in the foregoing respects, while plaintiff was at that point driving his team, and its engine collided with said team and wagon," causing the injuries of which complaint is made.

The facts and circumstances connected with the accident appear from the testimony of the plaintiff and the witness, Mrs. Jennie Priestly, who was riding with the plaintiff at the time of the occurrence. It appears that on September 16, 1901, the plaintiff and his lady companion left Salt Lake City for Park City with a light wagon and team. Traveling through Parley's Canyon in an easterly direction, they crossed the railroad track to the north side thereof, and, looking up the canyon, they saw an engine headed toward Park City, standing still and taking water at the water tank. At, and for some distance above, the crossing, there was considerable space between the track and the cliff of rocks on the north, but as they approached the engine the space became narrower until they reached a point about 200 feet west of the engine, where the space between the bottom of the cliff and the track was about 12 feet wide. This narrow space continued for a distance of about 60 or 70 feet, when it widened out again. As they thus drove along the railroad track, they saw the engine at the water tank nearly all the time, but saw no one on or about the engine. After the team had started into the narrow place and gone to a point about 175 feet from the engine, the engine started towards them without blowing the whistle or ringing the bell, and making just "the ordinary noise of an engine as it rolls over the rails—nothing unusual." Neither the plaintiff nor his companion made any effort, by calling or otherwise, to attract the attention of those in charge of the engine, until it started to move towards them,

when they called, but apparently were not heard by them. At the sight of the moving engine the horses were frightened, and when it was about opposite them they whirled suddenly around toward the track, and in doing so one of them was struck by the tender, the vehicle overturned, and the plaintiff injured. The horses were not on the track at all.

In the course of his examination as a witness, the plaintiff, respecting the occurrence, testified: "When I saw that engine only 600 feet away, I didn't know which way it was going when it started. I didn't know anything about it. I looked up the track and saw the engine when I crossed the track several hundred feet below the engine. After crossing, I drove along substantially parallel with the railroad track. With very few exceptions, I could see the engine all the time, and I noticed it there all the time. My companion was sitting in the seat with me. I kept a lookout all the way up from the crossing, and I knew I was coming to the narrow place in the highway. I didn't know that the engine was going to start. It had been standing there all the while I had been in sight, and I thought I would get through. The distance the highway ran close to the track is about 60 or 70 feet. My team was trotting, and is perfectly gentle. I have driven them around railroad trains before; ordinarily they are not afraid of them. The place where the accident happened is 150 feet from where the engine was standing. The team whirled pretty near the end of the narrow space nearest the engine—150 feet from where the engine stood. The lower end of the narrow space would be about 50 feet from where the accident happened, so when I started in the narrow space the engine was about 200 feet away, and the team was trotting. I didn't see any one in the engine or working about it. I didn't see the engineer or the fireman until immediately after the accident. When I started into the narrow space on the trot I didn't give them any signal, but as soon as I saw them start I hollered. I don't know whether the

engineer and fireman knew whether I was traveling along there or not. They told me afterward that they didn't. I could have hollered in time, and I did as soon as I thought there was any danger. When I started into that narrow space I could have hollered and made them hear me, but I did not holler until the engine started. The engine then was about 175 feet from me when it started. It came down the track with the tender first. I saw it start, and it wasn't necessary to whistle or ring the bell to let me know that the engine was starting. I don't know what effect the blowing of the whistle would have had on them; it might have scared them all the more--I don't know. It wouldn't have helped me a particle to blow the whistle or ring the bell before they started if they had kept on coming down. If they had blown the whistle or rung the bell just before starting, I would have been out of there flying, because all I had to do was to let out the lines and the horses would go like the wind. My horses were not afraid when the engine started about 175 feet away. There was no whistle or ringing of the bell as it came down the track. It just made the ordinary noise of an engine as it rolls over the rails—nothing unusual. When I drove up in that narrow place I knew that the engine, after it had got through taking water, would start. I didn't know which way it would start. They could have heard me holler, the moment before they started, better than after starting."

The witness Mrs. Priestly, as appears from the transcript and respondent's brief, among other things testified: "When Mr. Fares started in the narrow place he drove rapidly, so as to get out of the way, for fear the engine might come. That was spoken of. He whipped up, and the horses were pretty good travelers. We were both looking at the engine, and could not see anybody around it. When we got about half way up this narrow place the engine started. When we started into the narrow place we talked about the fact that the

engine might start, so we concluded to drive rapidly to get out. The conclusion was that, as the engine was standing still, we would have time to get through. When the engine started, it didn't have to whistle to let us know it was starting, because we saw it start. They didn't ring the bell. They came rather quickly. When the engine started, the horses commenced to rear; that is, when the engine was away a few yards." The witness further testified: "When the engine started it did not make any other noise than an engine will going over the rails, but its movements scared the team as soon as it started."

Under this and other evidence of similar import, the jury returned a verdict in favor of the plaintiff for the sum of $5,150, and judgment was entered thereon accordingly. Thereupon the defendant prosecuted this appeal.

BARTCH, J. (after stating the facts).—When the plaintiff rested his case, the defendant interposed a motion for a nonsuit, upon the ground, among others, that the railroad company was not shown to have been guilty of any negligence whatever in operating its engine on the occasion in question. The motion was overruled. Then, when both sides rested, the defense requested the court to instruct the jury to return a verdict in favor of the defendant, which request was refused, and thereafter a motion for a new trial denied.

The appellant under proper exceptions, complains, in the first instance, of these several rulings of the court, and insists that the evidence shows, without conflict, that the defendant was entitled to a verdict and judgment as matter of law. The contention is that the railroad company is not liable to the plaintiff for the injury sustained by him, under the circumstances connected with the accident and disclosed in evidence, and this contention appears to be well founded. The defendant had a right, under the law, to construct and operate its railroad through the canyon,

and in doing so it was compelled, owing to the physical conditions of the canyon, to run parallel with and in close proximity to the highway. To hold that the railroad company was guilty of negligence in constructing its railroad parallel with and adjoining the highway would practically be to hold that railroads could not be constructed and operated in canyons in this intermountain country, for ordinary observation demonstrates the utter impossibility of constructing railroads through these precipitous canyons without, in places, encroaching to some extent upon highways and rendering them less safe. This the respondent appears to admit, for while in the complaint, he alleged negligence in the construction and operation of the railroad so close to the highway that a team could not pass with safety, he offered no proof in support of such allegations; yet one who alleges negligence has the burden to prove it. He must show, as to an act lawful in itself, the commission of it, at the time, place, or in the manner, was unlawful. We must therefore assume that the railroad was lawfully constructed at the place in question, notwithstanding its close proximity to the highway and the cliff of rocks north thereof. It is apparent that railways and highways must, of necessity, in some places, run side by side. In such cases the inconvenience to passing teams occasioned by the construction and operation of the railroad is compensated for by the greater convenience to the general public in the more rapid and improved method of intercommunication and transportation. The railroad in the present instance having been lawfully constructed at the place where the accident occurred, the railroad company had a right to stop its engine at the water tank, and, after taking water, to again move it in pursuit of its business; and the moving of the engine, without making any unnecessary noise, or any more noise than an engine ordinarily makes in rolling over the rails, as is admitted in this case, was not an act of negligence, even though the appearance of the moving engine frightened the respondent's horses.

A railroad company has the undoubted right to run its engines and trains on its railroad adjoining the highway, and is not responsible to travelers whose horses become frightened by the appearance of such engines or trains, if the same are operated prudently, and without unnecessary noise or willful disregard of a traveler's perilous position, after it has been discovered by the servants of the company.

Nor is a railroad company required to keep a lookout specially for travelers upon the highway, where the railroad and highway run parallel with and are in close proximity to each other. Under no circumstances is it required to exercise more than ordinary care towards persons traveling along a highway adjacent to the railroad. It is its duty, primarily, and in the highest degree, to keep a lookout upon its track to discover persons or vehicles that may be upon or crossing the track, so as to avoid collision with them. This duty is enjoined upon it not only to avoid injury to those who may be upon or crossing its track, but also for the safety of its passengers, whom it has contracted to carry safely. It is true that when those in charge once discover a traveler, on an adjacent highway, in a perilous position, they are bound to recognize his situation, and to refrain from doing any heedless or wanton act which will increase the danger of his surroundings, and, if they fail to do so, the company will be liable for resulting injury and damages; but no such liability attaches for the mere failure of servants, while in the exercise of proper care in running engines or trains, to observe a traveler upon an adjacent parallel highway, who may be in a perilous position because of the fright of his horses at the appearance of an engine or train. Nor is a railroad company, as alleged in the complaint, required to keep its engines and cars so under control that they can be stopped if any team is found at a point of danger on an adjoining highway; nor is it bound to exercise the same degree of care, as contended for by the respondent, at all points of known or reasonably

apprehended danger, in keeping a lookout, and in the operation of its engines and trains alongside the highway, as it is required to exercise at grade crossings. Such rules would render the operation of railroads in this mountainous country, where such places of danger are almost innumerable, well-nigh impracticable, and would release travelers upon the highway from their duty of themselves keeping a lookout for their own safety.

In Lamb v. Old Colony Railroad, 140 Mass. 79, 2 N. E. 932, 54 Am. Rep. 449, a case in many respects like the one at bar, the plaintiff was driving his horse along a highway parallel to and adjoining the defendant's railroad, and the evidence was uncontradicted that the railroad and highway were adjoining each other for more than a mile. The plaintiff's horse was frightened by the smoke from the engine of a train passing on the railroad in the direction opposite to that in which plaintiff was going, and the plaintiff was injured in consequence. The smoke was occasioned by the act of firing up the engine on the stretch of railroad adjoining the highway. There was no evidence that the defendant's servants knew that the plaintiff was on the highway, but there was evidence that they would have seen him if they had been on the lookout for travelers on that part of the highway. The court, holding that it was not the duty of those on the engine to be on the lookout for travelers on the highway who might be endangered by such act, in the course of its opinion said: "The defendant had a right to run its trains on its railroad adjoining the highway, and was not responsible to travelers on the highway for the consequence of noise, vibration, or smoke caused by the prudent running of its trains. . . . Under such circumstances, the firing up near the highway, and the smoke occasioned by it, were ordinary incidents of running the train, as much so as the smoke when not firing, or the noise or vibration caused by the cars; and they were not of themselves evidence of negligence. . . . The lawfulness

of the act cannot depend upon whether a traveler happens to be at such a distance from the engine that he will not be endangered by the smoke caused by it, or in such a position that he cannot be seen by the fireman or engineer. If it is their duty to see one traveler outside the location of the railroad, it is their duty to see how many travelers are there, and to observe the position, direction, and speed of each, the speed of the engine, the state of the atmosphere, the direction and force of the wind, the character of the coal used, and other circumstances which may determine whether all travelers are, and will continue to be until the smoke is dissipated, in such positions that their horses will not be affrighted by it. Being under no obligation to watch for travelers on the highway, the defendant could not have been guilty of negligence in not seeing and avoiding the plaintiff.''

So, in Dewey v. Chicago, M. & St. P. R. Co., 99 Wis. 455, 75 N. W. 74, an engine of the defendant, in charge of its servants, passed over a street crossing, and, after going a short distance beyond it, was brought to a stop. The plaintiff was riding in a buggy drawn by a single horse, and, when he approached the crossing, the engine, in plain sight, started, and made a slight exhaust or puff, and steam and smoke escaped, but there was nothing unusual as to the noise, steam, or smoke. There was a strong wind blowing, which carried the steam and smoke directly towards the horse, whereby it became frightened and uncontrollable, overturned the buggy, and injured the plaintiff. At the close of the evidence a nonsuit was granted. In affirming the judgment of nonsuit, the appellate court said: ''They had a right to move the engine in pursuit of defendant's business in which they were engaged, and without responsibility on defendant's part for the consequences of any of the ordinary noises which the operation of the engine caused, or such incidents as the ordinary escape of smoke and steam. If such were not the case, railway companies would be greatly embar-

rassed in the performance of the duties they owe to the public. There appears to have been an utter failure to show any excessive or unreasonable blowing off of steam, or any unusual noise, or anything not ordinarily attendant upon the usual movements of a locomotive. That, where injuries result from the frightening of horses by the sight of moving cars, trains, or locomotives, or the usual noises or incidents of their ordinary operation, there is no liability on the part of the railway company, is firmly established and recognized as the law."

In Ryan v. Pennsylvania R. Co., 132 Pa. 304, 19 Atl. 81, the plaintiffs were driving under the defendant's railroad, on a city street, when a train of cars overhead frightened their horse so that he became unmanageable. They were thrown out of their carriage, one of them severely injured, and their child killed. The jury, under a binding instruction, rendered a verdict for the defendant. In affirming the judgment, the Supreme Court said: "The defendant company was operating its road in a lawful manner. No defect was shown in the construction of the road. On the contrary, it was the work of competent engineers, approved by the chief engineer and surveyor of the city, and in pursuance of an ordinance of councils expressly authorizing it. The sight and sound of a moving train always have a tendency to frighten horses. In this case the fright was occasioned by the sound. We can not measure, nor can a jury be properly allowed to measure, the amount of sound which may be made by a railroad train, either in crossing bridges at overhead crossings or at other places. The defendant company, under all the authorities, has the right to operate its road in a lawful manner; and when it does so without negligence, and without malice, it is not responsible for the injuries occasioned thereby." 2 Thomp., Neg., section 1908; Bailey v. Hartford & Conn. V. R. R. Co., 56 Conn. 444, 16 Atl. 234; Beatty v. Central Iowa R. Co., 58 Iowa 242, 12 N. W. 332; Webb v. Railway Co., 202 Pa.

511, 52 Atl. 5; Hahn v. S. P. R. R. Co., 51 Cal. 605; Lake Shore & M. S. Ry. Co. v. Butts (Ind. App.), 62 N. E. 647; Hendricks v. Fremont E. & M. V. R. Co. (Neb.), 93 N. W. 141; Leavitt v. Terre Haute & I. R. Co. (Ind. App. ), 31 N. E. 860; Abbot v. Kalbus, 74 Wis. 504, 43 N. W. 367; Cahoon v. Chicago & N. R. Co., 85 Wis. 570, 55 N. W. 900; Howard v. Union Freight R. Co., 156 Mass. 159, 30 N. E. 479; Omaha & R. V. Ry. Co. v. Brady (Neb.), 57 N. W. 767; Lake Erie & W. R. Co. v. Juday (Ind. App.), 49 N. E. 843; Ohio Val. R. Co. v. Howerton (Ky.), 72 S. W. 760; McCerren v. Alabama & V. Ry. Co. (Miss.), 18 So. 420; Chicago & E. R. Co. v. Cummings, 24 Ind. App. 192, 53 N. E. 1026; Ohio Val. R. Co. v. Young (Ky.), 39 S. W. 415.

It is, however, insisted by the respondent that it was imperative upon the defendant to blow its whistle, and ring its bell, before it moved its engine down along the highway, and that the plaintiff had a right to expect that some signal would be given. We do not think that the failure to sound the whistle or ring the bell was negligence under the circumstances. On the contrary, we are inclined to the view that to have done so on that occasion would have rendered the defendant guilty of negligence, because, since the plaintiff was aware of the presence of the engine, it would have been an unnecessary thing to do, and in all probability would have frightened the horses more, and added to the peril of the occupants of the vehicle. As will be observed, the plaintiff himself, in his testimony, said: "I saw it start and it wasn't necessary to whistle or ring the bell to let me know that the engine was starting." He also stated that he did not know what effect the blowing of the whistle would have had upon his horses; that "it might have scared them all the more;" and that the sounding of the whistle or ringing of the bell would not have helped him a particle if the engine had kept on coming down. If, under the then existing circumstances, the whistle had been sounded or the bell rung, would not the respondent now be contending that

the servants of the defendant aggravated his perilous position unnecessarily and willfully by the additional noise? And could it be said that such contention would be altogether without force? It is true the blowing of the whistle and ringing of the bell are ordinary incidents to the operation of railroads, and when the whistle is sounded or the bell rung, without fault or negligence, no liability results therefrom; but it may be quite otherwise when the act is done unnecessarily, willfully, or wantonly, to the injury of those in close proximity, or who may be traveling upon a highway close by. In such event the act, lawful in itself, may be become unlawful, and the guilty party amenable to damages. The fact that there was a grade crossing several hundred feet below the place of the accident, upon approaching which a signal was ordinarily required to be given, is immaterial under the circumstances. The accident did not happen at the crossing. And, even if the failure to give a signal for the crossing amounted to negligence, that negligence did not cause injury to the plaintiff, and therefore he cannot avail himself of it. Nor, if the defendant had discovered the plaintiff in his perilous position, would the nearness of the engine to the crossing, under the circumstances, have justified the defendant in the doing of an act, though lawful, unnecessarily or heedlessly, which would have rendered such position yet more dangerous. "Courts," says Mr. Justice Brewer, in Culp v. A. & N. R. Co., 17 Kan. 475, "must take knowledge of the fact that the blowing of a whistle is one of the ordinary signals used in the running of a train, and that in the management of locomotive engines it is at times necessary to open the valves and permit the escape of steam. But still these acts, which at times are legal and necessary, may be done without any necessity therefor, out of mere heedlessness and negligence, or with a wanton and criminal intent to do wrong. That a party has a right, to do a given act at certain times and under certain

circumstances, does not prove that the same act is right under all circumstances and at all times." 2 Thomp. Neg., sections 1909-1911; Wabash R. R. Co. v. Speer, 156 Ill. 244, 40 N. E. 835; Billman v. Indianapolis, C. & L. R. R. Co., 76 Ind. 166, 40 Am. Rep. 230; Petersburg R. R. Co. v. Hite, 81 Va. 767; Stanton v. Louisville & N. R. R. Co. (Ala.), 8 So. 798; Philadelphia etc., R. R. Co. v. Stinger, 78 Pa. 219; Northern Pacific R. Co. v. Sullivan, 53 Fed. 219, 3 C. C. A. 506.

After careful examination of the testimony in this case, and taking every fact of which there is any evidence as proven, we are unable to see wherein the defendant was guilty of negligence. If there was any negligence on the occasion in question, it was on the side of the plaintiff himself. He has shown nothing to excuse his heedless act in driving from a place of comparative safety into that narrow space with the engine in plain sight, ignorant of when it would start, or where it would go, whether toward or from him, and making no effort, until the engine started, to attract the attention of the defendant's servants, so as to disclose to them the perilous position into which he had placed himself and his companion. He fully realized the danger of his undertaking, but concluded to take the chances of getting to a place of safety before the engine would start. He failed in his calculations, and has but to attribute his misfortune to his own want of ordinary prudence and caution. Justice will not permit compensation in damages as a result of such heedlessness. In deciding such questions as this, we cannot be unmindful of the fact that the rights of others are involved. We may concede the right of a man to risk his own life and the lives of his horses, but not the right to imperil the lives of others, who may be on the engine or train, by his lack of caution. The misfortune might have been much greater if, through his unwarranted assumption of risk, his horses had gotten upon the track and been struck by the engine. We are clearly of the opinion that, under the facts and circumstances in evidence, the court

ought to have granted a nonsuit, or, at the close of the testimony, instructed the jury to return a verdict for the defendant, and that, having failed to do either, a new trial ought to have been ordered.

The judgment must be reversed, with costs, and the case remanded for further proceedings in accordance herewith. It is so ordered.

McCARTY, J., concurs.

BASKIN, C. J. (dissenting).—It appears from the evidence that the place on the public highway where the injury occurred was a dangerous one; that the engine, as the plaintiff traveled toward it, was standing still a short distance beyond and in full view of the dangerous point in the highway, and headed in the opposite direction from which the plaintiff was approaching. In view of these facts it was the duty of the employees of the company in charge of the engine, before starting it in the backward direction, to look and see that no one in vehicles was at the dangerous place. This they failed to do, and in my opinion it was negligence for which the railroad company is responsible.

I cannot, therefore, concur in the reversal of the judgment.