## STATE v. DEVOT.

No. 4325. . Decided December 7, 1925.   (242 P. 395.)

CRIMINAL LAW—ONE OBTAINING MONEY BY FALSE TELEGRAM
HELD TO HAVE COMMITTED CRIME IN STATE WHERE MONEY GIVEN
TO TELEGRAPH COMPANY FOR TRANSMISSION.  Where defendant
in California sent a telegram to one in Utah under a false
name, requesting that money be telegraphed to him, pursuant
to which sendee deposited money in Utah office of telegraph
company, requesting it to be sent to California, *held*, that tele-
graph company was thereby made agent of defendant to receive
the money for him in Utah, and hence crime of obtaining money
by fraud was committed in Utah, giving court of that state
jurisdiction.

STRAUP, J., dissenting.

Appeal from District Court, First District, Cache County;
*M. C. Harris*, Judge.

Charles Devot was convicted of obtaining money by fraud,
and he appeals.

AFFIRMED.

*Fonnesbeck & Nelson*, of Logan, for appellant.

*Harvey H. Cluff*, Atty. Gen., and *L. W. Miner*, Asst.
Atty. Gen., for the State.

THURMAN, J.

The defendant was convicted by the verdict of a jury in
the district court of Cache county of the crime of obtain-
ing money by fraud and sentenced to serve an indeterminate
term in the state prison.

The material evidence in the case was stipulated by the

Corpus Juris-Cyc. References.
[1]   Criminal Law, 16 C. J. pp. 190 n. 72; 191 n. 74, 75.

parties and set forth in the bill of exceptions. The follow-
ing facts are not in dispute: On the 28th day of July, 1925,
one C. M. Hammond, at Logan, Cache county, Utah, re-
ceived a telegram by Western Union Telegraph Company
purporting to come from his son, Joseph Hammond, at Los
Angeles, Cal., requesting the said C. M. Hammond to tele-
graph him at Los Angeles the sum of $142. Pursuant to
said request the said C. M. Hammond immediately depos-
ited the sum requested in the office of the said telegraph
company at Logan, with directions that the said amount be
delivered to Joseph Hammond in Los Angeles. Identifi-
cation was expressly waived. It appears from the evidence
of C. M. Hammond that after depositing the money and re-
turning to his home he had some doubts as to the genuineness
of the telegram he had received, but "decided to let it go."
A few days later another telegram purporting to be from
Joseph Hammond at Los Angeles was received by C. M.
Hammond at Logan making a further request for money.
The matter was then referred to the sheriff of Cache county,
resulting in the arrest of the defendant at Los Angeles. De-
fendant waived extradition and came to Utah in charge of
the officers.

The defendant, testifying in his own behalf, admitted re-
ceiving the money in Los Angeles, but disclaimed sending
the telegram to C. M. Hammond. His explanation of the
transaction was to the effect that he became acquainted with
a person in Los Angeles representing himself to be Joseph
Hammond; that said person informed him that money had
been telegraphed him by his father and that the telegraph
company had refused to deliver the money to him' because
he was under the influence of liquor when he applied for it;
that inasmuch as there had been a change of shift in the tele-
graph office the said person claiming to be Joseph Hammond
requested the defendant to assume his name and make ap-
plication for the money; that he did as requested and ob-
tained a draft for the sum of $142; that he delivered the
draft to the supposed Joseph Hammond, who was waiting
down the street about a half block away; that the next

day he saw the supposed Joseph Hammond and was informed by him that he had been unable to cash the draft, for the reason that the bank required identification by some one who had money in the bank; that he then requested defendant to go into the telegraph office where he had received the draft and get it cashed; that defendant did so and received the money, which he thereafter delivered to the supposed Joseph Hammond; that defendant received no consideration other than the use of a room which the supposed Joseph Hammond had paid for in advance and a loan from him of $4 or $5.

The defendant further testified that he believed that said person was in truth and in fact the son of C. M. Hammond, as he represented himself to be, and was entitled to receive the money; that defendant did not know there was any fraud in connection with the draft or in receiving the money; that when he procured the draft to be cashed he indorsed it in the name of Joseph Hammond; that on the next day the said supposed Joseph Hammond informed him that there was some more money for him at the telegraph office, and stated that since defendant was known there as Joseph Hammond "he better go and get this money also"; that defendant went to the office and asked if there was more money for Joseph Hammond, and was thereupon arrested; that he then, with the officers, went to the place where he expected to find the supposed Joseph Hammond, but he had disappeared.

A Los Angeles detective testifying for the state, after identifying defendant as the person arrested in Los Angeles charged with the offense on trial, said that while in jail in Los Angeles the defendant admitted to him that he knew the man posing as Joseph Hammond was a fraud, and that it was a crooked game, but that he (defendant) "was short o'f money and decided he would go in with the other party with the understanding that the other was to give him a portion of a split of the proceeds."

It is stipulated in the bill of exceptions that the appeal is not made on the ground that the evidence is insufficient to support the verdict, but on the ground that the court

has no jurisdiction of the defendant. The bill also shows that the defendant duly excepted to the refusal of the court to give his requested instructions Nos. 1 and 4. It was further stipulated that the real Joseph Hammond did not send the telegram in question or receive the money. Several exhibits are referred to by letter in the bill of exceptions, but they were not made part of the record on appeal, and are therefore not before the court. Defendant's request No. 1, to the refusal of which defendant excepted, was a peremptory instruction to find the defendant not guilty. Request No. 4 reads as follows:

"You are instructed that if you believe from the evidence that the money, if any, was delivered to, and received by, the defendant in Los Angeles, Cal., then you are instructed that this court is without jurisdiction, and your verdict should be, for the defendant, not guilty."

The refusal to give the request just quoted and defendant's exception thereto, as we interpret the stipulation, presents the only issue to be determined on this appeal. Assuming that the evidence is sufficient to support the verdict, if the court had jurisdiction, we now proceed to a consideration of the question involved.

Appellant's contention is that as the undisputed evidence shows that the defendant received the money at Los Angeles, and that that is where the money was obtained, therefore the offense of obtaining money by fraud, if any offense was committed, occurred outside the state of Utah; that defendant could not be charged with obtaining money in Logan unless the telegraph company was his agent to receive the money. Appellant vigorously contends, as matter of law, that the telegraph company was not the agent of defendant. On the other hand, respondent insists that the telegraph company was the defendant's agent, and upon this single issue, in the last analysis, the lines of battle are drawn.

It will be remembered that C. M. Hammond, at Logan, Utah, telegraphed the money at that point to the supposed Joseph Hammond at Los Angeles, at his request; that the defendant in this case admitted to the detective, at Los Angeles, that he knew the supposed Joseph Hammond was

a fraud; that it was a crooked game; but that being short of money he decided to go in with the other person on the understanding that he was to have a split of the proceeds.

The jury was warranted in finding that defendant was in the "game" from the beginning. In fact, under all the circumstances, the jury was warranted in finding that the defendant, alone, either sent or authorized the sending of the telegram by which the fraud was consummated and the money obtained.

Appellant refers us to numerous cases holding that the offense of obtaining money by fraud, or under false pretenses, is triable only in the jurisdiction where the money was obtained, and quotes from 16 C. J. title "Criminal Law," § 273, the following:

"The general rule is that the crime of obtaining money or property by false pretenses is completed where the money or property is obtained, and that, if the pretenses are made within one jurisdiction and the property or money is obtained in another, the person making the representations must be indicted in the latter jurisdiction."

See, also, the following cases relied on by appellant: *Graham* v. *People,* 181 Ill. 477, 55 N. E. 179, 47 L. R. A. 731, *State* v. *House,* 55 Iowa, 466, 8 N. W. 307; *State* v. *McGinnis,* 71 Iowa, 685, 33 N. W. 338; *State* v. *Smith,* 162 Iowa, 336, 144 N. W. 32, 49 L. R. A. (N. S.) 834; *Stewart* v. *Jessup,* 51 Ind. 413, 19 Am. Rep. 739; *Com.* v. *Van Tuyl,* 1 Metc. (Ky.) 1, 71 Am. Dec. 455; *Connor* v. *State,* 29 Fla. 455, 10 So. 891, 30 Am. St. Rep. 126; *People* v. *Cummings,* 123 Cal. 269, 55 P. 898; *Bates* v. *State,* 124 Wis. 612, 103 N. W. 251, 4 Ann. Cas. 365 and note; *Burton* v. *U. S.,* 196 U. S. 283, 25 S. Ct. 243, 49 L. Ed. 482.

These cases do not go to the meat of the question presented here. The rule therein stated may well be conceded. The question here, however, is, "Where was the money obtained?" If the telegraph company was the agent of the defendant to receive the money then, under the undisputed evidence, the defendant received the money in Logan. This, in our opinion, is a sensible rule, well supported by both reason and authority.

Immediately following the passage quoted by appellant from C. J., supra, the rule is stated as follows:

"Where, induced by false pretenses, one transmits by mail to defendant. money, drafts, or other writings, such mailing is a delivery to the postmaster as the agent of defendant, to be forwarded to him, and the offense is committed where the letter is mailed, and is indictable at such place. Where the false pretenses are made in one jurisdiction, and in reliance on such pretenses goods are delivered to a carrier for shipment to defendant, the carrier acts as agent of defendant, so that the delivery to the carrier is a delivery to defendant; and accordingly the venue is properly laid in the county in which the goods are so delivered, unless there was a special agreement for delivery to the consignee in a county other than that from which the goods were shipped."

In Brill, Cyc. Crim. Law, vol. 1, at page 543, the general rule relied on by appellant as quoted from C. J. is affirmed. The author, however, at page 543, says:

"In several cases it has been held, to sustain jurisdiction, that delivery to a carrier or agent for defendant at his request is a delivery to defendant and completes the offense at the point of such delivery, and it has been further held that in such a case the prosecution not only may but must be had at the point of such delivery."

Respondent also refers to the following cases: *State* v. *Gibson* (Iowa) 106 N. W. 270; *In re Stephenson*, 67 Kan. 556, 73 P. 62; *Com.* v. *Taylor*, 105 Mass. 172; *State* v. *Lichliter*, 95 Mo. 402, 8 S. W. 720; *Morris* v. *State* (Ohio) 18 Am. Rep. 291; *Com.* v. *Karpowski*, 167 Pa. 225, 31 A. 572. These cases support the text quoted from C. J. and Brill, supra, upon which respondent relies. See, also, *People* v. *Adams*, 3 Denio (N. Y.) 190, 45 Am. Dec. 468; *Com.* v. *Wood*, 142 Mass. 459, 8 N. E. 432. Some English cases are to the same effect. *Regina* v. *Jones*, Eng. Law & Eq. 533, 4 Cox Crim. Cas. 198; *Rex* v. *Brisac*, 4 East, 164. In a note to *State* v. *Smith* (Iowa), reported in 49 L. R. A. (N. S.) at page 835, it is said:

"The place where the property is delivered to a carrier for transport to the defendant is the place where the defendant should be indicted for obtaining such property under false pretenses. [Citing cases.] This is upon the theory that the carrier is the agent of the defendant to receive and transport, as the title has passed, subject only to the right of stoppage in transitu."

In his reply brief appellant refers us to many cases, but the question of agency, which in our opinion is a controlling question here, does not appear to be involved. The cases, however, are: *People* v. *Ballas,* 55 Cal. App. 748, 204 P. 401; *People* v. *Steffner,* 67 Cal. App. 1, 227 P. 690; *State* v. *Roy,* 155 La. 238, 99 So. 205; *Dechard* v. *State,* (Tex. Cr. App.) 57 S. W. 813; *Pepper* v. *People,* 75 Colo. 348, 225 P. 846; *State* v. *Smith,* 162 Iowa, 336, 144 N. W. 32, 49 L. R. A. (N. S.) 834.

As hereinbefore stated the exhibits were not made a part of the record. The telegram in question is not before the court, but as we interpret the bill of exceptions stipulated by the parties the telegram specifically authorized the sending of the money by telegraph and expressly adopted that means of perpetrating the fraud. C. M. Hammond testified that on July 28th he received a telegram which he believed to be genuine and to be from his son, Joseph Hammond, and that in pursuance of the request in the said telegram he deposited in the Logan office $142 and requested that the same be sent without identification. This is corroborated by the telegraph operator who wired the money. There is not a scintilla of evidence by way of contradiction. We are of the  opinion that the telegraph company was thereby made the agent of defendant to receive the money for him in Logan, Utah, and that there is where the money was fraudulently obtained. We are heartily in accord with the authorities relied on by appellant that the offense is not complete until the money is obtained by the defendant; but there is nothing in the views herein expressed in any manner conflicting with the rule.

Near the close of their reply brief counsel for appellant, by way of emphasizing the awful consequences which would result if respondent's contention were adopted, use the following language:

"Let us suppose the converse of the facts in the case at bar. Suppose here in Utah, by means of false representation, the defendant induced a party in California to wire him some money, and suppose that the defendant is apprehended in this state where he received the money; could he successfully maintain that he was not

subject to the jurisdiction of the courts in this state, that the only court which had jurisdiction to try him was the court in the county in California from where the wire was sent ordering the payment of the money to him here? Yet that is exactly what the courts in this state would have to hold if the state's contention in the case at bar is sustained; or else this court would have to hold that the defendant may be twice put in jeopardy and twice prosecuted for the same offense."

In the light of the law as we have found it, and to facilitate the due and proper administration of justice, we do not hestitate to hold that, if some person in Utah should fraudulently obtain money from a citizen of California by means substantially similar to those employed in the instant case, the case should be tried in California where the injury was done and the consequences of the wrong inflicted.

The judgment of the trial court is affirmed.

GIDEON, C. J., and FRICK and CHERRY, JJ., concur.

STRAUP, J. I dissent. We are agreed that the crime of obtaining property or money by false pretenses or fraudulent means is completed where the property or money is obtained; and, if the pretenses are made in one jurisdiction and the property or money obtained in another, the offense is indictable only in the latter jurisdiction. What chiefly divides us is: (1) Where was the money here obtained? And (2) whether the place where it was obtained was one of fact for the jury or of law for the court, and whether in such respect error was committed in the court's refusal to charge as requested by the defendant.

Our statute (Comp. Laws Utah 1917, § 8344) provides that "every person who knowingly and designedly, by false or fraudulent representations or pretenses, shall obtain from any other person any chose in action, money, goods, wares, chattels, effects, or other valuable thing, with intent to cheat or defraud any person of the same" is punishable, etc. That the word "obtain" as used in the statute means to get hold of; to get possession of; to acquire; and that to obtain money or property by false pretenses, etc., there must be a delivery, and that title or right of possession of and control over it must pass out of the accuser and vest, at least for some

time, in the accused before the offense is complete (*State* v. *McGinnis*, 71 Iowa, 685, 33 N. W. 338), is, as I understand, not disputed. That there should be a physical delivery by the accuser to the accused in person is not essential. It suffices if it be made to one designated by the accused to receive the goods or money, if by such delivery the property passed out of the title, possession, and control of the accuser and into that of the accused as completely as if a physical delivery had been made to the accused in person (*Bates* v. *State*, 124 Wis, 612, 103 N. W. 251, 4 Ann. Cas. 365); that is, whether the delivery be to the accused in person or to some one designated by him to receive the goods or money, the title or possession and control must not only have passed out of the accuser, but it also must go to and be in or under the accused. So long as the title remained in or the property was subject to the control of the accuser, before the accused actually received the goods or money, the latter had not, within the meaning of the statute, yet obtained it.

By the prevailing opinion the case in hand is likened to that of goods and chattels delivered to a common carrier for transportation. It may be stated as a general proposition that, where goods are delivered to a common carrier for transportation to a consignee without any qualification or restriction, the consignor parts with the goods and all control over them, subject only to his right to a stoppage of the goods in transitu and his lien for freight charges, and in such case the carrier becomes the agent of the consignee; but, if the shipper or consignor reserves any right to control the goods, the carrier is the agent of the consignor. 1 Michie on Carriers, § 803. Such rule of agency, however, is founded on the fact that the title to the goods and right of possession of and control over them passed from the consignor and vested not in the carrier, but in the consignee. By some of the cases cited in the prevailing opinion this doctrine is applied to criminal cases of obtaining goods or chattels by false pretenses, etc., on the theory that the carrier being the agent of the accused, the latter obtained the goods when

and where they were delivered by the consignor to the carrier for transportation to the accused, and hence hold that the prosecution is properly brought where the goods were so delivered to the carrier. Other courts repudiate such doctrine as applied to such criminal cases, and particularly as is shown by the cases of *Commonwealth* v. *Schmunk,* 207 P'a. 544, 56 A. 1088, 99 Am. St. Rep. 801, and *Ex parte Parker,* 11 Neb. 309, 9 N. W. 33. Though the Schmunk Case seems to be well considered and the subject therein treated at some length, yet it may be conceded that there are a greater number of cases holding against the rule therein announced. However, assuming the doctrine applicable to criminal cases, nevertheless I think the circumstances and facts incident to and the legal status arising out of a consignment of goods and chattels to a common carrier for transportation are not analogous to the case in hand.

The bill of exceptions in such particular recites: The agent or operator of the Western Union Telegraph Company at Logan, Utah, a witness called by the state, testified that he received a telegram, Exhibit A (which, as stated in the prevailing opinion, is not in the record), from Los Angeles and caused it to be delivered to C. M. Hammond, the accuser, in Cache county, Utah, to whom the telegram was directed; that in response to the telegram Hammond came into the Logan office and deposited $142 in currency, and requested the witness to transfer the same by telegraph to Joseph Hammond (his son) at Los Angeles; and that in pursuance thereof the telegram company at Los Angeles issued its draft which was, at Los Angeles, by it, delivered to the defendant, who pretended to be Joseph Hammond. C. M. Hammond, also a witness for the state, testified that he received the telegram which he believed to be genuine and to be from his son, Joseph, who was then residing at San Francisco, and that in pursuance of the request in the telegram he deposited $142 with the telegraph company at Logan and requested that it be sent without identification; that after doing so and going home and talking the matter over with his wife he grew a little suspicious and wondered

whether or not it could have been a fraud, but decided to let it go. The accused, on receiving the draft at Los Angeles, attempted there to cash it at a bank, but failed to get the cash because he was not able to identify himself as the payee of the draft, and thereupon he took the draft back to the telegraph office at Los Angeles, where he indorsed it to the company and there obtained the money called for by the draft.

. When goods are delivered to a common carrier for transportation, it, of course, is manifest that such particular goods are to be transported and delivered to the consignee and not some mere evidence or token upon which, when presented, goods of like kind in quantity and quality may be obtained elsewhere; and, further, and of more importance, the title and right of possession of the particular goods or chattels so delivered to the carrier pass from the consignor and vest not in the carrier, but in the consignee. Certainly no one would contend that if one in Los Angeles, by false pretenses or by some fraudulent scheme or plan, by mail or otherwise, ordered goods from another in another state, and such other, instead of shipping goods so ordered, transmitted to the accused some token, upon the presentation of which to a warehouse or wholesaler at Los Angeles the ordered goods were there obtained, the accused obtained them at any place except at Los Angeles. When C. M. Hammond, the accuser, paid over to and deposited with the telegraph company at Logan the $142 in money, it of course is manifest that such particular money or any money was not, nor was anything, to be physically transported or transmitted; and, in the very nature of things, money by telegraph is not transmitted as are goods or chattels, nor does the title to the money paid over to or deposited with the telegraph company vest in the person to whom it is to be paid, but vests in the company. In transmitting money by wire, as we say, the telegraph company does what it here did, but issues its check or draft to some designated person, or, if it chooses, pays him in money. But the money so paid to or deposited with the company becomes the money and property of the

company, just as money deposited by one in a bank becomes the money of the bank, and the company or bank becoming a mere debtor or obligor to repay it either to the depositor or to some one designated by him, and, when it is paid, it is paid as it here was, out of its own funds. In other words, the relation so created is not one of agency, but that of an independent contractor. When the money was so paid to the telegraph company, it either, by an express or an implied contract, agreed to pay an equivalent amount of money at Los Angeles to the son of the depositor, the person designated to whom it was to be paid, and, upon the company's failure so to do, it became liable either to the depositor or to the person to whom it was to be paid. But such liability would not rest on the theory that the company was the agent of either the depositor or of the person to whom the money was to be paid, but on the theory of a breach of its contractual obligation to pay the money as it either expressly or by implication had agreed to do. The depositor, having paid the money to the telegraph company at Logan, let it be assumed he there lost it. The question, however, is not, Where did the accuser lose it, but, When and where did the accused obtain it? Had the money, after it was deposited with or paid over to the company at Logan there, been lost or destroyed it is clear that the loss would have been that of the company, and in such case its contractual obligation, regardless of the loss, was the same after the loss as before the loss—to pay at Los Angeles to the designated person the amount of money received by it—and that the accused, within the meaning of the statute, did not receive the money, did not obtain it, until the company's draft at Los Angeles was delivered to him and was negotiated or cashed by him, or at least not until the draft was delivered to him, for until then he had not received, acquired, or obtained anything. It is to illustrate and support such proposition that the cases of defendant are cited. In the prevailing opinion it is said that in some of the cases cited by him it did not appear that the question of agency was involved. Of course not. I do not think it is here involved.

The question here is not one of agency, but one of, Where did the accused obtain the money? No case is cited involving facts or a situation similar to those here involved which holds that the telegraph company became the agent of the sendee or of the person to whom the money deposited was to be transmitted. Because of the cases holding there is an agency under a consignment of goods to a carrier for transportation and that the carrier becomes the agent of the consignee, the conclusion is reached that the telegraph company here must have been or was the agent of the accused. For the reasons already stated, and because of entirely different facts and .of an entirely different situation, I think such a conclusion is not justified, and, because the claimed agency may exist in the one instance, it does not follow that it existed in the other.

I have endeavored to point out that transmitting money by telegraph is not analogous to consigning goods or chattels to a common carrier for transportation. However even on the theory of agency, I think there is no analogy. In the one instance, the carrier becomes the agent of the consignee; but, in transmitting messages, it is held by some courts (*Des Arc O. M. Co.* v. *Western Union T. Co.*, 132 Ark. 335, 201 S. W. 273, 6 A. L. R. 1081) that the telegraph company, as between the sender and the sendee, is the agent of the sender and not of the sendee, and by others (*Eureka C. M.* v. *Western Union T. Co.*, 88 S. C. 498, 70 S. E. 1040, Ann. Cas. 1912C, 1273) that as between the sender and the sendee the telegraph company is not the agent of either, but is an independent contractor, and liable to either who suffers injury as the proximate result of a breach or neglect of duty. Thus, if the first view be taken, the telegraph company becomes the agent of the sender, and, if the other view be adopted, it is the agent of neither the sender nor of the sendee. Because the accused wired the accuser to send him money no more made the telegraph company the agent of the accused than of one who wrote to or wired another to wire him an answer to a certain communication or proposition. So, adopting the one view, the telegraph com-

pany was the agent of the sender, and, adopting the other, it was the agent of neither.

The theory of agency in case of a consignment of goods to a common carrier rests not on the fact that the consignee ordered the goods and shipment of them, but that the consignor, when he delivered them to the carrier for transportation, parted with the title and right of possession to and control over the property, and that such title and right passed to and vested in the consignee. On the theory of agency, the use of the telegraph more nearly is analogous to sending mail, where according to some of the authorities, the postmaster and the mail service is regarded the agent of the sender, but not of the addressee or sendee, although the weight of authority, as later will be seen, is that the post office or mail service is not the agent of either the sender or sendee. That the money and title thereto paid by the accuser to the telegraph company did not vest in the accused, but in the telegraph company, the cited case of *Burton* v. *United States*, 196 U. S. 283, 25 S. Ct. 243, 49 L. Ed. 482, is, I think, pertinent. There a real estate company in Missouri sent Burton, in Washington, D. C., its check drawn on a bank in Missouri. Burton deposited the check in a bank at Washington and was there given credit therefor on his account. The check in due course was forwarded by the Washington bank to the Missouri bank, where it was paid. The question was, Where did Burton receive the money? It was the theory of the government that he received it in Missouri; that when he indorsed the check and deposited it in the Washington bank that bank became his agent for the collection of it, and on the theory of such agency payment to the Washington bank in Missouri was payment to Burton, and hence it was contended by the government that the prosecution was properly laid in Missouri. The federal District Court held with the prosecution. The Supreme Court, in reversing the judgment, held that there was no agency between Burton and the Washington bank, and that no agency was involved; that when he took his check to the bank and the bank received it and placed

the amount to his credit the relation of creditor and debtor between them was created, and not that of principal and agent; that a deposit made in a bank of money, or of drafts or checks received and credited as money, title to the money, checks, and drafts vested in and became the property of the bank with an implied contract on its part to pay an equivalent amount when called on so to do.

The case is important as illustrating not only the want of the claimed agency, but also as the place where the money was paid and obtained, the place where Burton received the check and deposited it to his credit. To the same effect is the cited case of *State* v. *Smith,* 162 Iowa, 336, 144 N. W. 32, 49 L. R. A. (N. S.) 834. Other cases cited by the defendant in principle also show and illustrate that the accused here received, obtained, the money in Los Angeles and not in Logan, and especially the cases of *People* v. *Steffner,* 67 Cal. App. 1, 227 P. 692; *People* v. *Ballas,* 55 Cal. App. 748, 204 P. 401; *State* v. *Roy,* 155 La. 238, 99 So. 205. And, applying the principle or rule therein announced, I think it is clear that the accused did not obtain the money until he received the draft at Los Angeles and negotiated or cashed it, or at least not until he received the draft. Suppose after the money was paid to the telegraph company at Logan by the accuser, and before the company's draft was issued or the money paid to the accused, a complaint had been filed as here; could it be contended that the commission of the offense was then complete, that the possession of the money in the hands of the telegraph company was the possession of the accused, and that he thereby acquired it, obtained it, just as though it had there been paid over to him in person? Or suppose the accuser, before the draft was issued or money paid by the telegraph company, had for any reason countermanded his direction and demanded a repayment of the money to him, with the result that the draft was not issued nor any money paid to the accused; could it be contended that the accused possessed, acquired, or obtained anything? Or suppose the accuser had deposited with or paid money to a bank at Logan and caused it to

wire to a bank at Los Angeles to pay the accused an equivalent amount, and the bank at Los Angeles issued its check or draft to the accused; could it be contended that the accused possessed, acquired, or obtained anything until he received the check or draft? Could it in such case be contended that the Logan bank became the agent of the accused and that the money paid to it by the accuser became the property of the accused; that the title thereto and the right of possession and control over it passed from the accuser to the accused? No one would hardly contend that; and yet it seems to me such a situation is quite analogous to that here.

It is also claimed that where a draft is mailed to the accused, if received and negotiated or cashed by him, the offense is complete where the draft addressed to the accused was deposited in the mail. In the first place we have no such situation. In the next place such a contention is made largely because of the case of *Commonwealth* v. *Wood,* 142 Mass. 459, 8 N. E. 432. It there was held that delivery of a draft took place upon its deposit in the post office, and that such delivery determined the jurisdiction where the prosecution should be brought. The reason given therefor was that when the accuser deposited the draft ''in the post office it passed out of his control and into the control of the defendant, and the postmaster became the agent of the defendant to forward the letter (containing the draft) to him.'' Such holding was based on the authority of *Reg.* v. *Jones,* 4 Cox C. C. 198. But the contrary was held in *Reg.* v. *Holmes,* 12 Q. B. D. 23, where a draft was sent from France to England; the court deciding that it had jurisdiction as the money was paid in England. I think the weight of authority on the subject is as stated in *Bates* v. *State,* supra, that—

"The crime of obtaining money by means of false pretenses is committed where the money is obtained, and hence the court has no jurisdiction where it is shown that defendant procured a draft to be sent to and paid by a bank outside the state."

To the same effect are the cases of *State* v. *Hudson,* 13 Mont. 112, 32 P. 413, 19 L. R. A. 775, and *People* v. *Rathbun,*

21 Wend. (N. Y.) 509, the latter being an exhaustive treatise on the subject. In 1 Mechem on Agency, § 41 (2d Ed.), the author while stating that carriers, express companies, and some other quasi public companies, in the conduct of the business, may become agents therein for another, yet observes a distinction as to such public instrumentalities as the mail and telegraph. In holding that the latter usually are not agents, he says:

"The distinction in the case of a governmentally conducted institution like the post office is not difficult. And in the case of the telegraph, though the authorities are not uniform, the tendency of the more recent cases is to regard it not as the agent of one who undertakes to deal through its instrumentality, but as a public institution undertaking to serve all who employ it, and liable for its own negligence or default."

And the weight of authority cited by him is to the effect that a telegraph company is not an agent even as to the sender, but is an independent principal or contracting party.

Had the accuser sent his check to the accused drawn on a Los Angeles bank, it is clear that no funds or money thereby would have been transferred from him to the accused, or that title to any funds or money passed out of the accuser and into the accused, either when the check was issued or received by the accused, and that the latter acquired no money until he had negotiated the check or deposited it or cashed it. It can make no difference had the accuser drawn a check on a bank at Logan. Had he done so, again no title to any funds or money passed out of him and into the accused, either when the check was issued or received. In such respect, what difference does it make if the instrument be a draft instead of a check? When it is observed that the issuing of a check or draft does not thereby transfer any money or funds and does not even operate as an equitable assignment of funds or money, it at once is apparent that the case of *Commonwealth* v. *Wood,* supra, holding that the place where a draft was deposited in the post office determined the place where the accused obtained the money has no foundation either in law or in logic. As well could it have been said in the Burton Case, where the

checks and draft were by the realty company deposited in the post office in Missouri, that Burton in Missouri received and obtained the money, and hence the prosecution was properly brought in Missouri, but the Supreme Court of the United States held against such a contention. And the numerous cases cited by the defendant show that in a charge of obtaining money by false pretenses, where the money as here was received by the accused by means of a draft or check, the place where he obtained the money was where he cashed or negotiated the check or draft or deposited it to his credit.

The gravamen of the crime is obtaining the property described in the information or indictment. The statute, like every criminal statute, must receive strict construction. In pursuance of such view, the proof must show the obtaining of the particular property so described, or some part of it. And, where the charge is the obtaining of money, the proof must show that money as such passed from the hand of the defrauded person to that of the accused (*State v. Bates,* supra), not that the delivery may not be made to or through another designated by the accused for such purpose, but that the title, right of possession, and control, nevertheless must be as full and complete in the accused as a delivery to him in person would be. The accused, of course, received money, but he received it at Los Angeles. He received it on the draft and not until after the draft was when the draft was delivered to him, and had he then been issued and delivered to him. Had the transaction · ended arrested, the accused could have been prosecuted for obtaining the draft, a chose in action, by false pretenses. But such charge, it is clear, would have to be brought in Los Angeles, where the draft was issued and delivered to him where he obtained it. In such case it is plain the telegraph company was not the agent of the defrauded person or of the accused. Though regarding the company as either such an agent or as a principal, still the draft, nevertheless, was issued and delivered to the accused at Los Angeles and was there received by him. Up to that time I do not see how

he could have been prosecuted for obtaining money, for the authorities generally hold that an allegation of obtaining money is not satisfied by proof of obtaining evidences of money indebtedness or orders to pay money. At that stage of the transaction all that the accused could have been prosecuted for was obtaining the draft by false pretenses. But as soon as he negotiated or cashed or deposited the draft to his credit the offense of obtaining money, and not until then, was complete; and, as it appears to me, the last act necessary to complete such offense was committed in California and not in Utah. And it is only by indulging not a presumption of law, but a mere legal assumption or an untraversable fiction of law of an unwarranted agency that the court below had jurisdiction. I say untraversable, for on the fact that the accused wired the defrauded person to send money by telegraph the legal assumption of agency is regarded as conclusive and not allowed to be traversed. While legal assumptions or fictions of law are sometimes indulged to give the court jurisdiction, still I do not think they ought to be indulged against the accused in a criminal action.

In the information it is alleged that the accused in Utah devised means by false pretenses "to obtain and get into his custody and possession money of C. M. Hammond" with the intent to defraud him, and sent from Los Angeles a telegram to C. M. Hammond, at Cache county, Utah, forging the name of Hammond's son on the telegram, and pretending that it was sent by his son, and requesting C. M. Hammond to telegraph his son $142, and C. M. Hammond, relying on the telegram, "delivered to the Western Union Telegraph Company at its office at Logan, Cache county, Utah, as requested by the said forged telegram, and as the agent of the said defendant, the said sum of $142," etc. On the evidence adduced the defendant requested the court to charge the jury:

"That if you believe from the evidence that the money. if any, was delivered to and received by the defendant in Los Angeles, Cal., then you are instructed that this court is without jurisdiction, and your verdict should be for the defendant."

The court refused the request. Nowhere did the court charge the jury that to convict the defendant a finding was necessary that he obtained the money in Cache county, Utah, and not in California. Nor did the court charge or direct the jury that the telegraph company was the agent of the defendant, or that payment or delivery of the money to it by C. M. Hammond was payment or delivery to the defendant, or that its possession was the defendant's possession. What legal status or relation, if any, was created between the telegraph company at Logan and the accused, the jury was not advised. As near as the court came to the matter was by an instruction charging the jury that all persons concerned in the commission of a crime, whether they directly committed the act or aided and abetted in its commission, are principals, and:

"So that in this case if the jury do not find beyond a reasonable doubt that the defendant sent the telegram in question, but do find beyond a reasonable doubt that at the time the defendant received the money from the telegraph company he knew that the false and fictitious telegram had been sent by some other person with intent to cheat and defraud the witness Hammond, and the defendant received the money from said telegraph company for the purpose and with the intent of aiding and abetting some other person in perpetrating such fraud upon the witness C. M. Hammond, and thereby obtained his property by false pretenses, then you may find the defendant guilty, but, unless you so find, you should find the defendant not guilty."

From this charge it is thus seen that the court did not submit the case to the jury on the theory of the state that the telegraph company was the agent of the defendant, and that a delivery of the money to it at Logan by C. M. Hammond was a delivery to the defendant, and that hence the money was there obtained by him. That the defendant's refused request stated the law that, if the money "was delivered and received by the defendant in Los Angeles," etc., the Utah court was without jurisdiction, cannot be doubted. The only ground which would justify a refusal of such a request is that there was no evidence in the record tending to show that the money was delivered or received in Los Angeles, and that the evidence so conclusively

showed, either as matter of fact or by operation of law,
that it was delivered to and received by the defendant in
Utah as not to permit the jury, even in a criminal case, to
find or infer to the contrary, or even to have a reasonable
doubt concerning it. If the request was refused on such
ground, then why did not the court tell the jury that the
telegraph company at Logan was the agent of the defend-
ant, and that a delivery of the money there by C. M. Ham-
mond to it was a delivery to the defendant, and that by
reason of such delivery the defendant then and there ac-
quired and obtained the money, and that the jury as matter
of law were required to so find, and were not permitted to
have even a reasonable doubt about it? But this the court
did not do, either in substance or effect, but, as is seen, gave
an instruction that, if "at the time the defendant received
the money from the telegraph company," he knew the
telegram which had been sent was false and fictitious and
sent to cheat and defraud C. M. Hammond, and the defend-
ant "received the money from the telegraph company" to
aid some other person to perpetrate a fraud on C. M. Ham-
mond, etc., then the jury were directed that they might find
the defendant guilty; otherwise not guilty. By that charge
what meaning did the court convey to the jury as to the
place "the defendant received the money from the tele-
graph company"? Is it not clear from the company at
Los Angeles. The record shows he there physically and
actually received it "from the telegraph company" and
received no money physically or otherwise "from the tele-
graph company" at any other place. At least on the record
and the charge, unless otherwise directed or cautioned, the
jury was likely to regard the phrase "from the telegraph
company" to mean the company at Los Angeles where the
money was physically received by the defendant, or that
it made no difference whether from the company at Los
Angeles or at Logan. Thus by refusing the defendant's
request, and by charging the jury as was done, the un-
doubted thought was conveyed to the jury that they prop-
erly could convict the defendant, though the money was

delivered to and received by him at Los Angeles.

I thus think the court had no jurisdiction of the offense, and, at least, that the court erred in refusing the defendant's request, and that the judgment of the court below should be reversed.