**DONAHUE et al. v. WARNER BROS.
PICTURES, Inc., et al.**

No. 4208.

United States Court of Appeals
Tenth Circuit.

Jan. 4, 1952.

Rehearing Denied Feb. 16, 1952.

Preston D. Richards, Salt Lake City, Utah (Rich & Elton, Salt Lake City, Utah, on the brief), for appellants.

Dennis McCarthy, Salt Lake City, Utah and Morris Ebenstein, New York City, for appellees Warner Bros. Pictures Distributing Corp. and Intermountain Theatres, Inc.

C. Vernon Langlois, Salt Lake City, Utah, was on the brief for appellees Arch E. Overman and C. E. Overman.

Before PHILLIPS, Chief Judge, and BRATTON, HUXMAN, MURRAH, and PICKETT, Circuit Judges.

BRATTON, Circuit Judge.

Section 103–4–8, Utah Code Annotated 1943, provides among other things that any one who uses for advertising purposes or for purposes of trade the name, portrait, or picture of a person, if such person is living, without first having obtained the writ-ten consent of such person, or, if such person is dead, without the written consent of his heirs or personal representatives, shall be guilty of a misdemeanor. And section 103–4–9 provides in presently material part that any living person, or the heirs or personal representatives of any deceased person, whose name, portrait, or picture is used within the state for advertising purposes or for purposes of trade, without written consent being first obtained as provided in the preceding section, may maintain an action against such person so using his name, portrait, or picture to prevent and restrain the use thereof; and may in the same action recover damages for any injuries sustained by reason of such use, and if the defendant shall have knowingly used such person's name, portrait, or picture in such manner as is declared to be unlawful, the jury or court, if tried without a jury, may in its discretion award exemplary damages.

Alice M. Donahue, Alma Donahue, Barbara Donahue, and Constance Donahue instituted in the state court of Utah this action against Warner Brothers Pictures, Inc., Warner Brothers Pictures Distributing Corporation, Intermountain Theatres, Inc., Arch E. Overman, and C. E. Overman. It was alleged in the complaint that the defendants Warner Brothers Pictures, Inc., and Warners Brothers Pictures Distributing Corporation were corporations organized under the laws of New York; that the defendant Intermountain Theatres, Inc., was a corporation organized under the laws of Delaware; and that the defendants Arch E. Overman and C. E. Overman were citizens of Utah. It was further alleged that plaintiff Alice M. Donahue was the widow of Jack Donahue, deceased; that the other plaintiffs were the adult daughters of Donahue; and that plaintiffs were the sole and only heirs of Donahue. It was further alleged that defendant Warner Brothers Pictures, Inc., was engaged in the business of making moving pictures; that defendant Warner Brothers Pictures Distributing Corporation, a wholly owned subsidiary of defendant Warner Brothers Pictures, Inc., was engaged in the business of distributing moving pictures made by defendant Warner Brothers Pictures, Inc.;

that defendant Warner Brothers Pictures, Inc., made a moving picture entitled "Look for the Silver Lining," purposely depicting the career and using the name of Donahue as the leading male star therein; that the portrayal of Donahue in such picture was in part true to life but in many parts wholly untrue and without any factual basis whatever; that such picture was made without the consent or permission of Donahue, or of his legal representatives, or of plaintiffs; that the defendants had shown and exhibited the picture in theatres in Utah and throughout the United States; that such showings and exhibitions were for purposes of trade; that as the result, plaintiffs had been greatly vexed, annoyed, humiliated, and caused mental and physical suffering; and that defendants knowingly and wilfully refused to discontinue showing and exhibiting the picture, and unless restrained would continue to show and exhibit it. The prayer was for actual damages in the sum of $200,000, exemplary damages in the sum of $150,000, and equitable relief in the form of an injunction to restrain the further showing or exhibition of the picture.

Defendants Warner Brothers Pictures Distributing Corporation and Intermountain Theatres, Inc., caused the action to be removed to the United States Court for Utah. The ground of removal was that the complaint set forth a separate and independent claim or cause of action as to each removing defendant which would be removable if sued upon alone; and that such separate and independent claim or cause of action was joined with a claim or cause of action against defendants Arch E. Overman and C. E. Overman which was not removable.

After the cause had been removed to the United States Court, plaintiffs filed an amended complaint. In addition to realleging substantially all of the allegations contained in the original complaint, it alleged that Donahue was a dancer, singer, comedian, and entertainer; that he appeared in vaudeville but not in moving pictures or night clubs; that in addition to his stage performances, he wrote several articles which were published in the Saturday Evening Post, and in collaboration with an-

other person, he wrote a show. It further alleged that the portrayal of Donahue in the moving picture Look for the Silver Lining was in part true to life, but in most parts was wholly untrue and without any factual basis whatever; that such picture truly depicted the life of Donahue insofar as it represented that he was a dancer and danced with Marilyn Miller in the shows "Sunny" and "Rosalie"; and that in all other respects it was without any factual basis. And following that general allegation, it alleged certain particulars in which the moving picture was without any factual basis. In addition, it alleged in paragraph 9 thereof that plaintiff Alice M. Donahue, in collaboration with one Fay Pulsifer, wrote and prepared a manuscript portraying the true life of Donahue, but that by reason of the showing and exhibition of the picture Look for the Silver Lining, plaintiffs had been prevented from selling the manuscript. Again, the prayer was for actual damages in the sum of $200,000, exemplary damages in the sum of $150,000, and an injunction to prevent defendants from further showing or exhibiting the picture.

Defendants Warner Brothers Pictures Distributing Corporation, Intermountain Theatres, Inc., Arch E. Overman, and C. E. Overman, filed two motions. One was to strike paragraph 9 of the amended complaint on the ground that the allegations contained therein were immaterial and irrelevant to any purported cause of action stated or to any relief requested in the amended complaint; and the other was for summary judgment on the ground that it appeared from the pleadings, depositions, admissions on file, together with the affidavits attached to the motion, that there existed no genuine issue as to any material fact and that each defendant was entitled to judgment as a matter of law. Paragraph nine of the amended complaint was stricken; summary judgment was entered dismissing the action with prejudice; and plaintiffs appealed.

The question of removability presents itself. It is provided by statute—28 U.S.C. § 1441(c)—that where a separate and independent claim or cause of action,

which would be removable if sued upon alone, is joined with one or more otherwise nonremovable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction. The claim or cause of action pleaded in the complaint in this case was one in tort. The tort as alleged was the wrongful showing of the moving picture with the name and portrayal of Donahue therein. That was the wrong charged for which relief was sought. According to the allegations in the complaint, all of the defendants acted together in exhibiting or showing the picture in theatres in Utah and elsewhere in the United States which constituted a wrongful invasion of the rights of plaintiffs. If as pleaded all the defendants joined in such wrong, there was no separate and independent claim or cause of action pleaded against the removing defendants. And the cause was not subject to removal on the ground set forth in the petition for removal. American Fire & Casualty Co. v. Finn, 341 U.S. 6, 71 S.Ct. 534, 19 A.L.R.2d 738; Willoughby v. Sinclair Oil & Gas Co., 10 Cir., 188 F.2d 902; Snow v. Powell, 10 Cir., 189 F.2d 172.

■ While the cause was not subject to removal on the ground of a separate and independent claim or cause of action against the removing defendants, complete diversity of citizenship existed between all plaintiffs on one hand and all defendants on the other; two of the defendants were citizens of Utah; and more than three thousand dollars, exclusive of interest and costs, was involved. Therefore the action was one falling within the original jurisdiction of the United States Court for Utah, and plaintiffs could have instituted it in that court in the first instance. After removal, plaintiffs did not challenge the removability of the cause either by motion to remand or otherwise. Instead, they filed an amended complaint in which both legal and equitable relief was affirmatively sought. Parties cannot by consent confer upon a court jurisdiction of the subject matter of an action which it would not have possessed without such consent. Neither

can voluntary action of parties in the nature of waiver confer jurisdiction of an action if the court would not have had jurisdiction of the subject matter without the waiver. But where a suit of which the United States Court may entertain original jurisdiction is instituted in the state court and the defendant obtains its removal even though removal is wholly unauthorized, and plaintiff acquiesces in such removal by seeking relief from the United States Court, that court acquires jurisdiction of the subject matter. Lopata v. Handler, 10 Cir., 121 F.2d 938; Cf. American Fire & Casualty Co. v. Finn, supra. The case being one of which the United States Court for Utah could have entertained original jurisdiction, and plaintiffs having acquiesced in the removal of it, the United States Court had jurisdiction; and its remand now is not required.

■ The action was one for legal and equitable relief for the wrongful violation of the right of privacy. The right of privacy may be defined in general language as the right of the ordinary person to enjoy life without his name or life being exploited for commercial purposes by the use of his name, or the publication or portrayal of his picture, or career, on the moving picture screen, in the press, in periodicals, in handbills, in circulars, in catalogues, or in other like manner unless his consent thereto be first obtained. The right is sometimes referred to as the right to be let alone. The principles together with their limitations or qualifications having appropriate application to the right of privacy were presented with erudite ability in an article written by Warren and Brandeis and published in 1890, 4 Harvard Law Review 190. One of the early cases in American jurisprudence dealing with the right was Schuyler v. Curtis, 147 N.Y. 434, 42 N.E. 22, 31 L.R.A. 286, decided a few years after publication of the article to which reference has just been made. There a nephew of a deceased aunt, on behalf of himself and other immediate surviving relatives of the deceased, sought to enjoin the exhibition of a statue of the deceased without the consent of plaintiff and other surviving relatives. The court held that whatever right of privacy the

aunt had terminated at her death and did not pass to her heirs or relatives; that plaintiff and other surviving relatives did not represent any right of privacy which she had during her lifetime; and that plaintiff and other surviving relatives were not entitled to injunctive relief on the ground that the exhibition of the statue would constitute an invasion of their personal feelings or sentiments concerning the memory of the deceased. In Roberson v. Rochester Folding Box Co., 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478, plaintiff was a young woman whose photograph or likeness had been appropriated for advertising purposes by a milling company. She sought damages for past wrongful use of the photograph or likeness and also an injunction to restrain future use of it. It was said in the opinion of the court that the legislature could very well provide that no one should be permitted for his own selfish purpose to use the name or picture of another for advertising purposes without his consent, but that the legislature had not done so. And it was held that in the absence of legislation to that effect, plaintiff was without remedy in the courts. At its next session after that case was decided, and primarily in response to the suggestion contained in the opinion of the court, the legislature of New York enacted sections 50 and 51 of the Civil Rights Law of that state, making penal the use of one's name, picture, or portrait for advertising purposes, or for purposes of trade, without his written consent being obtained, and creating a civil right to damages for past wrong of that character as well as injunctive relief to prevent future wrong. For an authentic statement of that historic fact as a contributing factor to the enactment of the statute, see Rhodes v. Sperry & Hutchinson Co., 193 N.Y. 223, 85 N.E. 1097, 34 L.R.A.,N.S., 1143, affirmed 220 U.S. 502, 31 S.Ct. 490, 55 L.Ed. 561.

The legislature of Utah in the enactment of sections 103–4–8 and 103–4–9, supra, followed without deviation or departure the statute in New York in respect to the exploitation for commercial purposes, or for purposes of trade, the name, picture, or portrait of a living person without his written consent being first obtained. But the legislature of Utah did not stop there. In section 103–4–8 it also made penal the use for advertising purposes, or purposes of trade, the name, portrait, or picture of a deceased person, without the written consent of his heirs or personal representatives; and in section 103–4–9 it also provided with blueprinted clarity that the heirs or personal representatives of a deceased person shall be entitled to recover damages for injuries sustained by the wrongful use for advertising purposes, or for purposes of trade, of the name, portrait, or picture of the deceased person, and shall be entitled to restrain further or continued exploitation of that kind. By section 103–4–9, the legislature created the right of a living person to recover damages for such wrongful use of his name, portrait, or picture, and to enjoin further exploitation thereof; and in addition, it created a like right in the heirs or personal representatives of a deceased person whose name, portrait, or picture has been or is being used in that manner without first obtaining the consent in writing of the heirs or personal representatives. The statute created an independent right and provided a remedy for its enforcement. The purpose of the statute was to grant protection against the appropriation for commercial purposes of one's name, picture, or personality. And it should be given a liberal rather than a narrow construction. It should be construed liberally in the light of the legislative intent and purpose, not in a narrow manner which would tend to proscribe achievement of the desired legislative objective. Sarat Lahiri v. Daily Mirror, 162 Misc. 776; 295 N.Y.S. 382; Jackson v. Consumer Publications, 169 Misc. 1022, 10 N.Y.S.2d 691; Cf. Castle v. Delta Land & Water Co., 58 Utah 137, 197 P. 584.

A statute undertaking to forbid publication in the press or elsewhere of matters essentially educational or informative in character, or undertaking to prohibit the use of matters of that kind on the motion picture screen, would immediately suggest its own fatal infirmity. And similarly, a statute essaying to prevent the publication of current news, or the recounting or portrayal of actual events of public interest as is conventionally done in a con-

ventional newspaper or in a conventional newsreel on the motion picture screen, would be promptly challenged in respect to its validity on recognized grounds of long established principles of law. But this statute does not undertake to forbid any, every, and all use of the name, picture, or personality of an individual without written consent being first obtained. It is expressly confined to the appropriation of the name, picture, or personality of an individual for advertising purposes, or for purposes of trade. It is explicitly limited to exploitation of that kind. It does not undertake to forbid publication in the press or elsewhere of matters essentially educational or informative, even though the name or picture of an individual is used incidentally in connection therewith. Neither does it undertake to prevent the dissemination of news in which the public has an interest in the press, on the motion picture screen in the form of a newsreel, or otherwise, even though the name or picture of an individual is used incidentally in that connection. Binns v. Vitagraph Co. of America, 210 N. Y. 51, 103 N.E. 1108, L.R.A.1915C, 839; Humiston v. Universal Film Mfg. Co., 189 App.Div. 467, 178 N.Y.S. 752; Krieger v. Popular Publications, 167 Misc. 5, 3 N.Y. S.2d 480.

▮ Fairly construed, the amended complaint alleged in substance that with minor exceptions the moving picture in question was untrue; that it was essentially a product of fiction; and that as a part thereof, the name, picture, and personality of Donahue were used for purposes of trade, without the consent of plaintiffs being first obtained in the manner required by the statute. While by answer many of the material allegations contained in the amended complaint were denied, the motion for summary judgment admitted all matters well pleaded in such complaint. That was the posture of the case at the time the summary judgment was entered. The manufacture, distribution, and exhibition of a motion picture of the kind pleaded in the amended complaint, based primarily upon fiction or the imaginative, and designed primarily to entertain and amuse an audience desiring entertainment and willing to pay therefor, does not constitute the publication of information and educational matters, or the dissemination of news, or the recounting or portrayal of actual events of public interest in the form of a newsreel, as distinguished from commercial activities for gain or profit, within the intent and meaning of the statute. Binns v. Vitagraph Co. of America, supra; Humiston v. Universal Film Manufacturing Co., supra; Krieger v. Popular Publications, supra. According to the amended complaint, Donahue had been dead many years at the time of the institution of the action. And of course another person necessarily portrayed him in the moving picture. But his name was used and the moving picture purported to portray his personality and career. It was not alleged in the amended complaint that use was made of an actual photograph or portrait of Donahue. But that was unnecessary, as a picture within the meaning of the statute includes any representation of the person. Binns v. Vitagraph Co. of America, supra. To hold that the use of the name and the representation of the personality of Donahue in the manner alleged in the amended complaint fails to come within the purview of the statute would narrow the statute by a tortured construction not in harmony with its plain legislative intent and purpose.

▮ Endeavoring to sustain the summary judgment, appellees present the argument that Donahue was a public figure and that the statute does not forbid the use of the name or picture of such a figure without consent first being obtained. As previously indicated, it was averred in the amended complaint that Donahue was a dancer, singer, outstanding comedian, and foremost entertainer; that he starred and co-starred in productions in New York; that he did not appear in motion pictures or night clubs; that he wrote certain articles; and that in collaboration with another person, he wrote the script for a show. The statute was not intended to protect in undiminished degree the privacy of a public figure. By becoming a public figure, one may reliquish in part the right of privacy which would be his under other circumstances. Sidis v. F-R Publishing Corp., 2

Cir., 113 F.2d 806, 138 A.L.R. 15, certiorari denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462. The right may be waived completely or only in part. It may be waived for one purpose, and still be asserted for another. But the existence of the waiver carries with it the right to invade the right of privacy of the individual only to the extent legitimately necessary and proper in dealing with the matter which gave rise to the waiver. The question whether a person is a public figure and therefore has waived in part his right of privacy may rest upon various and variable facts and circumstances. And no rule of thumb has been evolved for its easy solution in all cases. Pavesich v. New England Life Insurance Co., 122 Ga. 190, 50 S.E. 68, 69 L.R.A. 101. We find ourselves unable to share the view that Donahue's accomplishments as a dancer, singer, comedian, entertainer, and writer, made him such a public figure that his name, picture, or career could be dramatized in a motion picture photoplay based primarily upon fiction and the picture exhibited in Utah for commercial purposes, without violating the right of privacy which the statute was intended to protect. Koussevitzky v. Allen, Towne & Heath, 188 Misc. 479, 68 N.Y.S.2d 779.

▇ In a further effort to uphold the summary judgment, appellees contend in substance that if the statute be construed as broad enough to prohibit the portrayal of a deceased public figure it would constitute an unreasonable restraint upon the guaranteed freedoms of speech and press. It is argued in support of the contention that dealing fictionally with deceased public figures is an important part of our culture, and the right to do so is one which is necessary for the survival of our culture; that in modern times the portraying of deceased public figures fictionally is one of the most common forms of artistic creation in the novel, drama, and motion picture; that motion pictures fictionalizing historical characters and events are common media of communicating ideas; and that to interpret the statute in such manner as to prevent the fictionalizing of a deceased public figure would constitute a restraint upon the freedom of that mode of expression, in violation of the constitutional guaranty of freedom of speech and of press. If the statute undertook to restrict or forbid the publication of matters educational or informative or strictly biographical in character, or the dissemination of news in the form of a newsreel or otherwise, it would be open to challenge on the ground of objectionable restraint upon the freedom of speech and press. But it does nothing of the kind. It is content to forbid the appropriation of the name, picture, or personality of an individual for commercial purposes, or for purposes of trade, as distinguished from the publication of matters educational or informative or purely biographical in kind, or the dissemination of news in the form of a newsreel or otherwise. And the constitutional guaranty of free speech and free press in its full sweep does not undertake to create an inviolate asylum for unbridled appropriation or exploitation of the name, picture, or personality of a deceased public figure for purely commercial purposes, or solely for purposes of trade, with the state powerless to enact appropriate forbidding or remedial legislation.

▇ In a still further effort to support the summary judgment appellees present the contention that the right of appellants to recover is governed by the law of California; that under the law of that state whatever right of privacy one has terminates upon his death; and that therefore recovery cannot be had in this case. Appellants reside in California. The motion picture was exhibited at a sneak preview in that state at which appellants were present prior to the time it was first exhibited in Utah. And under the law of California, the heirs of a deceased person cannot maintain in the courts of that state an action of this kind for the violation of the right of privacy of their deceased kinsman. Metter v. Los Angeles Examiner, 35 Cal.App.2d 304, 95 P.2d 491. But this was essentially a statutory action, with its source and genesis in section 103–4–9, supra. It was well within the competence of Utah to forbid commercial exploitation in that state of the kind alleged in the amended complaint and to provide a remedy in

its courts, without regard to whether like exploitation had previously occurred in another state in which no like remedy was afforded. Utah was not powerless to prohibit appropriation in that state of the name or picture of a person for purposes of trade, and to provide a remedy in its courts for a wrong of that kind, even though similar appropriation had previously taken place in another state where no remedy was available. And section 103–4–9 will be searched in vain for any legislative intent or purpose to exclude from its remedial reach instances of exploitation in which the seal of privacy had already been broken in another state where no relief could be had under domestic law. The statute does not provide that the heirs of a deceased relative may maintain an action of this kind if the law of the state where the seal of privacy was first broken creates or recognizes such right of action and provides a remedy for its enforcement. It does not contain any limitation or exception of that kind. It is couched in broad general language and indicates clearly a studied purpose on the part of the legislature to create the right in heirs of a deceased person to maintain an action of this kind for the violation of the right of privacy occurring in that state, without regard to the law of another state. The initial exhibition of the motion picture at the sneak preview in California and appellants seeing it there before it was shown in Utah did not as a matter of law bar recovery under the statute of Utah for the alleged wrongful exploitation of the name, picture, and personality of the deceased in Utah.

■ The question remaining for consideration is whether paragraph nine of the amended complaint was improvidently stricken. The action was essentially one in tort predicated upon the unlawful showing of the motion picture, and it was expressly alleged that by reason of such exhibition of the picture plaintiffs had been vexed, annoyed, humiliated, and caused great mental and physical suffering to their injury and damage. That was the gravamen of the action. And the allegations contained in paragraph nine respecting the inability of plaintiffs to sell a manuscript of the life

of Donahue did not bear any relevancy or materiality to such claim or cause of action. We do not explore or decide the question whether a claim or cause of action for being prevented from selling the manuscript could be asserted in a different manner or in a different proceeding. It is enough to say that the action of the court in striking paragraph nine from the amended complaint in its then present form did not constitute error.

The judgment is reversed and the cause remanded.

HUXMAN, Circuit Judge (concurring specially.)

I concur in Judge Bratton's opinion and in the judgment of the majority, but, in addition to what is said therein, wish to further amplify my views with respect to the rights of public figures under the Utah statute.

General statements are found in many cases arising under the common law, as well as in some of the cases arising under the statute of New York, to the effect that one who enters the public arena and thereby becomes a public figure waives his right of privacy, and by implication inferring that a different rule is to be applied in the case of one not in the public eye.

I think it may be conceded that a statute which prohibited free discussion of public figures with respect to their public activities or the free unlimited dissemination of information concerning them would offend against the right of free speech and a free press guaranteed by the Constitution. By analogy and like reasoning, it must be said that a statute which prohibited the dissemination of news and information concerning the lowly and the obscure would for the same reason be invalid. The difference is one of degree only as to what constitutes legitimate news and information. Obviously, a greater latitude of discussion is permissible with regard to famous characters than in the case of ordinary persons, because the interest in them and the thirst for information and knowledge concerning them is much greater than in the case of the lowly. But, whether we apply the rule to public figures or to ordinary persons,

the yardstick of measurement under the statute is the same. The test in every case is whether the publication is legitimate news or information within the scope and field of activities of the individual. If it is, it may be undertaken whether one is a public figure or an ordinary person.

There are no decisions by the Utah courts construing its statute, but since it is clear that but for the survival of the cause of action, it is identical with and was, perhaps, taken from the statute of New York, the decisions of the courts of that state construing its statute are persuasive. It would be better if this case had remained in the state court, where it belongs, so that in the first instance it could be construed by the courts of that state. But, being rightly here, as pointed out in Judge Bratton's opinion, it is our duty to construe it.

The Utah statute is general in its terms and being a remedial statute must be liberally construed to effectuate its salutary purpose. In broad, sweeping language and without exception it provides that one may not use the name, portrait, or picture of another for advertising purposes or for purposes of trade. It applies without limitation and with equal effect to the most famous as well as to the most obscure. There is nothing in the language of the statute indicating that a different yardstick is to be employed when measuring the rights of a public figure than in the case of an ordinary person. One may not thereunder violate the right of privacy of a public figure any more than he may violate such right of an ordinary person, merely because he is a public figure.

From the early cases of Binns v. Vitagraph Co. of America, 210 N.Y. 51, 103 N.E. 1108, L.R.A.1915C, 839 and Sarat Lahiri v. Daily Mirror, 162 Misc. 776, 295 N.Y.S. 382, to the late cases of Krieger v. Popular Publications, 167 Misc. 5, 3 N.Y.S. 2d 480, and Koussevitzky v. Allen, Towne & Heath, 188 Misc. 479, 68 N.Y.S.2d 779, the test laid down by the New York courts has been whether the article or publication was primarily historical for the education or information of the public, or primarily fictional for entertainment and amusement. If the article is historical, its publication is not a violation of the rights guaranteed under the statute, and if fictional, it constitutes a violation thereof, and while not so specifically stated in any of the opinions, because in every instance the case dealt with a public figure, I think the statement is warranted that if the article is fictional, it is a violation under the statute of the rights of public figures and of private persons alike. The same yardstick of measurement is to be applied in every instance, the length of measurement to be determined only by the status of the person being measured.

PHILLIPS, Chief Judge, with whom PICKETT, Circuit Judge, concurs, dissenting.

Alice M. Donahue, Alma Donahue, Barbara Donahue, and Constance Donahue commenced this action against Warner Brothers Pictures, Inc., and Warner Brothers Pictures Distributing Corporation, New York corporations, Intermountain Theatres, Inc., a Delaware corporation, and Arch E. Overman and C. E. Overman, in the District Court of the Third Judicial District in and for Salt Lake County, Utah, to recover damages for alleged violation of the right of privacy. The action was removed to the United States District Court for the District of Utah.

The original complaint alleged that Jack Donahue died October 1, 1930, at the age of 38 years; that Alice M. Donahue is the widow of Jack Donahue, deceased, and the remaining plaintiffs are the daughters of Jack Donahue, deceased; that the plaintiffs are the sole heirs of Jack Donahue; that at all times material in the action, Warner Brothers Pictures, Inc., was engaged in making motion pictures and its wholly-owned subsidiary, Warner Brothers Pictures Distributing Corporation, was engaged in distributing such motion pictures; that all the other defendants were engaged in exhibiting motion pictures made by Warner Brothers Pictures, Inc., and distributed by Warner Brothers Pictures Distributing Corporation; that Warner Brothers Pictures, Inc., had completed the making of a motion picture entitled,

16

"Look for the Silver Lining," purporting to depict the career and using the name of Jack Donahue as the leading male star in such motion picture; that the portrayal of Jack Donahue in such motion picture is in part true and in many parts wholly untrue; that neither the plaintiffs nor Jack Donahue ever consented to the making of such motion picture or the exhibition thereof; that during the six months preceding the filing of the complaint, the defendants caused such motion picture to be shown and exhibited in motion picture theatres, on numerous occasions, throughout the State of Utah and throughout the United States, and that such exhibitions of such motion picture vexed, annoyed, and humiliated plaintiffs and caused them great mental and physical suffering.

On motion of the defendants, the court ordered the plaintiffs to specify the nature and character of the career of Jack Donahue, and what parts of his career as portrayed in such motion picture were without factual basis. The plaintiffs filed an amended complaint, and, in response to such order, alleged therein that Jack Donahue began his career in the year 1910; that up to the year 1920 he appeared in vaudeville; that thereafter he also appeared in musical productions; "that he was famous principally as a dancer, although he was also recognized as an outstanding comedian and a good singer. That he was recognized as the foremost entertainer of his type, and was starred and costarred in many of the productions" in which he appeared; that such motion picture truly depicts the career of Jack Donahue as a dancer and that he danced with Marilyn Miller; that such motion picture is without factual basis, particularly in that it portrays Jack Donahue as being "unctuous, forward and brash in manner," and represents that Jack Donahue showed Marilyn Miller a picture of an infant at a time when he did not have any children, that he appeared with Marilyn Miller in opening shows and at a night club in London, and that he appeared in an act called "The Five Columbians," and therein met Marilyn Miller when she was a child.

Sections 103–4–8 and 103–4–9 of the 1943 Utah Code Ann.,Vol. 5, read as follows:

"103–4–8. Use of Name or Picture of Individual.

"Any person who uses for advertising purposes or for purposes of trade, or upon any postal card, the name, portrait or picture of any person, if such person is living, without first having obtained the written consent of such person, or, if a minor, of his parent or guardian, or, if such person is dead, without the written consent of his heirs or personal representatives, is guilty of a misdemeanor.

"103–4–9. Id. Civil Liability.

"Any living person, or the heirs or personal representatives of any deceased person, whose name, portrait or picture is used within this state for advertising purposes or for purposes of trade, without the written consent first obtained as provided in the next preceding section may maintain an action against such person so using his name, picture or portrait to prevent and restrain the use thereof; and may in the same action recover damages for any injuries sustained by reason of such use, * * *."

The defendants interposed a motion for summary judgment and introduced in support of the motion, without objection by the plaintiffs, certain evidence which established that each of the plaintiffs is domiciled in Los Angeles, California, and has been since 1936, and that none of them has ever resided in the State of Utah; that they first saw the motion picture at a preview thereof in Beverly Hills in March, 1949; that they never saw the motion picture in the State of Utah and did not know it had been shown in the State of Utah until they were informed by their counsel August 15, 1949, shortly before the institution of the instant action.

The trial court sustained the motion for summary judgment and plaintiffs have appealed.

The gravamen of the amended complaint is that the motion picture used the name and purported to depict the career of Jack Donahue, and that the portrayal was, in part, untrue.

I.

The showing of the motion picture in Utah was not within the prohibition of

the Utah statute, unless the name or the picture or portrait of Jack Donahue was used for advertising purposes or the purposes of trade. There was no use of a picture or portrait of Jack Donahue. It affirmatively appeared that the actor who portrayed Jack Donahue was not Jack Donahue. There was no use of the name of Jack Donahue for advertising purposes. The question is whether Jack Donahue's name was used for purposes of trade. No question of liability for libel is presented.

From the amended complaint it clearly appears that Jack Donahue was an outstanding actor and entertainer and a well known public figure.

Warren and Brandeis, in their essay on "The Right to Privacy," [1] which has come to be recognized as a legal classic, recognized that there were certain limitations to the right of privacy. The authors stated: "The right to privacy does not prohibit any publication of matter which is of public or general interest." [2] They further recognized that the courts, in enforcing the right, would have to reach a point of equilibrium between the individual's right of an inviolate personality and the right of the public to receive news items and matter that is informative or educational in character through free and unimpeded channels, [3] a harmonizing of individual rights with community and social interests. They further recognized a distinction between persons with respect to whose private affairs the community has no legitimate concern and public figures who have renounced their right to live their lives screened from public observation and who are the subject of legitimate interest to their fellow citizens. [4]

I am of the opinion that a line must be drawn between use for advertising purposes or purposes of trade and the publication of news and of matters which are informative or educational. I think "trade," as used in the statute, denotes barter, purchase, or sale of goods, wares, and merchandise, the furnishing of services, and other activities commercial in character, and that the prohibition is against the commercial exploitation of one's personality.

The Utah statute was derived from the New York statute (§§ 50 and 51 of the Civil Rights Law). While the Utah statute contains a provision, not found in the New York statute, giving a right of action to the heirs or personal representatives of a deceased person, in other respects it is not substantially different from the New York statute, and I think the decisions of the New York courts should be regarded as persuasive.

The New York statute "sought to protect the sentiments, thoughts, and feelings of an individual by embodying 'a legal recognition—limited in scope to be sure, but a clearly expressed recognition nevertheless —of the right of a person to be let alone, a right directed "against the commercial exploitation of one's personality." ' " [5]

In Roberson v. Rochester Folding-Box Co., 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478, the court held there was no common-law right of privacy in New York and recovery was denied to a woman whose photograph was used by the defendant, without her authorization, in advertising a brand of flour. As a direct result of the decision in that case, and primarily in response to a suggestion contained therein, the New York statute was enacted. [6] In Colyer v. Richard K. Fox Pub. Co., 162 App.Div. 297, 146 N.Y.S. 999, 1000 the court said: "The language of the statute

1. 4 Harv.L.Rev. 193.

2. See, also, Brents v. Morgan, 221 Ky. 765, 299 S.W. 967, 970, 55 A.L.R. 964.

3. See, also, Koussevitzky v. Allen, Towne & Heath, Inc., 188 Misc. 479, 68 N.Y. S.2d 779, 782; Barber v. Time, Inc., 348 Mo. 1199, 159 S.W.2d 291, 295.

4. See, also, Koussevitzky v. Allen, Towne & Heath, Inc., supra, 68 N.Y.S.2d at page 782; 4 Harv.L.Rev. 214, 215.

5. Koussevitzky v. Allen, Towne & Heath, Inc., 188 Misc. 479, 68 N.Y.S.2d 779, 781; Sarat Lahiri v. Daily Mirror, Inc., 162 Misc. 776, 779, 295 N.Y.S. 382, 385.

6. Sarat Lahiri v. Daily Mirror, Inc., 162 Misc. 776, 295 N.Y.S. 382, 385; Humiston v. Universal Film Mfg. Co., 189 App. Div. 467, 178 N.Y.S. 752, 756.

is very general and is susceptible of a very wide meaning * * * but this statute has been considered judicially many times since its original enactment in 1903, and we are admonished that its very general language must be interpreted in the light of its history and the evil at which it was aimed." See, also, Binns v. Vitagraph Co. of America, 210 N.Y. 51, 103 N.E. 1108, 1110.

The New York statute applies to an unauthorized use of a name or picture to sell a collateral commodity,[7] and to the unauthorized, fictional use of a name or photograph for advertising purposes or the purpose of trade.[8]

The New York statute does not apply to the publication and sale of a biography of a public figure, even though it contains untrue statements. Untrue statements in a biography do not transform it from biography into fiction.[9]

In Koussevitzky v. Allen, Towne & Heath, Inc., 188 Misc. 479, 68 N.Y.S.2d 779, at pages 783–784, the court, in holding that the book therein involved was a biography and not within the ban of the New York statute, although it, in part, was without factual basis, said:

"The book we are considering deals almost entirely with the plaintiff's musical career. Very little is said about his private life. Indeed, the author suggests that Dr. Koussevitzky had room for nothing in his life but music and a devotion to his loyal wife and helpmate. Interspersed with the chronological narration of the facts are stories and comments in connection with the plaintiff's musical career, some avowedly apocryphal, others of doubtful reliability. Curiously enough, although there are many depreciatory statements, they seem to be invariably followed by ameliorative obser-

vations of unreserved praise. The factual matter contained in the book testifies to the plaintiff's triumphs as a conductor of the Boston Symphony and other great orchestras, to his courage and independence, and to his devotion to the education and training of young musicians. Most people know that a great conductor's work with his orchestra is not altogether carried on in an atmosphere of sweetness and light. The author evidently knows that too and loses no opportunity to inform his readers about it. In his final chapter, the author gives his personal estimate of the plaintiff's place in musical history and in sentence after sentence we find that depreciation and praise vie with each other for utterance.

"There are statements in the book which the plaintiff might naturally find to be highly objectionable, if he is at all sensitive about those things. He may be able to prove some of them to be untrue and even defamatory. There are however, no so-called revelations of any intimate details which would tend to outrage public tolerance. There is nothing repugnant to one's sense of decency or that takes the book out of the realm of the legitimate dissemination of information on a subject of general interest."

In my opinion, the decision in Koussevitzky v. Allen, Towne & Heath, Inc., supra, is not in conflict with Binns v. Vitagraph Co. of America, 210 N.Y. 51, 103 N.E. 1108, 1109. The facts in the latter case were these: On January 23, 1909, the steamships Republic and Florida collided at sea. The Republic was equipped for wireless telegraphy and the plaintiff was the wireless operator. Immediately following the collision, he sent a distress signal which was received by a wireless operator on the steamship Baltic. Messages were there-

7. Koussevitzky v. Allen, Towne & Heath, Inc., 188 Misc. 479, 68 N.Y.S.2d 779, 783; Rhodes v. Sperry & Hutchinson Co., 193 N.Y. 223, 85 N.E. 1097; Eliot v. Jones, 66 Misc. 95, 120 N.Y.S. 989, affirmed, Id., 140 App.Div. 911, 125 N.Y. S. 1119; Neyland v. Home Pattern Co., 2 Cir., 65 F.2d 363.

8. Koussevitzky v. Allen, Towne & Heath, Inc., 188 Misc. 479, 68 N.Y.S.2d 779, 783.

9. Koussevitzky v. Allen, Towne & Heath, Inc., 188 Misc. 479, 68 N.Y.S.2d 779, 783; D'Altomonte v. New York Herald Co., 208 N.Y. 596, 102 N.E. 1101, modifying 154 App.Div. 453, 139 N.Y.S. 200.
See, also, Jeffries v. New York Evening Journal Pub. Co., 67 Misc. 570, 124 N.Y.S. 780, involving the use of a picture of a person in connection with his biography.

after exchanged between the plaintiff on the Republic and the operator on the Baltic, which resulted in the Baltic going to the rescue of the passengers on the Republic, who were removed from the Baltic and transported to New York. The plaintiff was the first wireless operator to use wireless when its use resulted in the saving of many lives. Soon after the day of the collision, the defendant proceeded to make a series of pictures entitled, "C.Q.D. or Saved by Wireless; A True Story of the Wreck of the Republic." These pictures, with the exception of one taken of the Baltic as it entered New York harbor, were manufactured or made up in the studio of the defendant by the use of scenery and actors employed to impersonate the plaintiff and others. The picture films from which moving pictures could be produced were exhibited in many places in New York. The pictures of the plaintiff appeared in the series five times and his name was used in subtitles six or more times. By the action, the plaintiff sought injunctive relief and damages under the New York statute. The court, after holding that the "use of the name, portrait, or picture of a living person in truthfully recounting or portraying an actual current event" would not be within the prohibition of the statute, said: "In the case before us, the series of pictures were not true pictures of a current event, but mainly a product of the imagination, based, however, largely upon such information relating to an actual occurrence as could readily be obtained" and held that the series of motion pictures were within the interdiction of the statute. The series of motion pictures were neither news nor biography.

It is my opinion that the Utah statute does not interdict the publication and sale of a written biography of a public figure or the biographical portrayal by motion pictures of the career of a public figure, even though such written biography contains untrue statements, or such motion picture portrayal in part is without factual basis, although such biography is written,

published, or portrayed with a profit motive.

The Utah statute, if not so construed, would violate the right of freedom of the press. In United States v. Paramount Pictures, 334 U.S. 131, the court, at page 166, 68 S.Ct. 915, at page 933, 92 L.Ed. 1260, said: "We have no doubt that moving pictures, like newspapers and radio, are included in the press whose freedom is guaranteed by the First Amendment." In Lovell v. City of Griffin, 303 U.S. 444, the court, at page 450, 58 S.Ct. 666, at page 668, 82 L.Ed. 949, said: "Freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." I see no distinction between a biography portrayed by written words and one portrayed by a motion picture. Indeed, today, in a large part, news and matter which are informative and educational in character are disseminated through the medium of the motion picture. While a motion picture or other pictorial portrayal of a public figure is intended to entertain as well as inform, the line of demarcation between informing and entertaining is too elusive to serve as a guide for the protection of the basic right of freedom of the press.[10]

I do not concede that the rather innocuous departures from the truth in the portrayal of the career of Jack Donahue in the motion picture here involved transformed it from a biographical portrayal into the category of a historical play. But, if it should be regarded as a historical play based on the career of Jack Donahue and a part of the theatrical history of his time, and employing Jack Donahue and Marilyn Miller as characters therein, I do not think a different result would follow.

Notwithstanding most historical novels and plays, while employing deceased public figures as characters and depicting the lives and careers of such characters, include imaginary characters and intersperse truth

10. Maloney v. Boy Comics Publishers, Inc., 277 App.Div. 166, 98 N.Y.S.2d 119, 123; Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840.

with apocryphal matter, they rank high on the basis of informative and educational values.[11]

If a historical play is within the interdiction of the Utah statute, then the portrayal on stage or screen in Utah, of "The

11. I quote from "A Guide to the Best Historical Novels and Tales":

"These Historical Novels have taught all men this truth, which looks like a truism, and yet was as good as unknown to writers of history and others, till so taught; that the bygone ages of the world were actually filled by living men, not by protocols, state-papers, controversies, and abstractions of men."

Carlyle on the Waverley Novels

"Those who know very little of the past and care very little for the future, will make but a sorry business of the present. * * * The great Duke of Marlborough said that he had learnt all the history he ever knew out of Shakespeare's historical plays. I have long thought that if we persuaded those classes who have to fight their own little battles of Blenheim for bread every day, to make such a beginning of history as is furnished by Shakespeare's plays and Scott's novels, we should have done more to imbue them with a real interest in the past of mankind than if we had taken them through a course of Hume and Smollett, or Hallam on the English Constitution, or even the dazzling Macaulay."

Lord Morley on "The Great Commonplaces of Reading."

"I take up a volume of Dr. Smollett or a volume of The Spectator, and say the fiction carries a greater amount of truth in solution than the volume which purports to be all true."

William Makepeace Thackeray.

*       *       *       *       *

"Sir Walter Scott is dead. Long live Sir Walter Scott! His great discovery that fiction and history are interchangeable is a basic patent, bound to reappear and reappear in the history of literature. * * * Not psychology, not realism, not the most intense modernism can kill the historical romance."

Henry Seidel Canby in "The Saturday Review of Literature."

and from "A Guide to Historical Fiction":

" * * * Historical fiction is not history, but it is often better than history. A fine historical painting, a pageant, or a play, may easily teach more and carry a deeper impression than whole chapters of description and analysis. *Esmond* and *Tom Jones* are indispensable adjuncts to Lecky. Scott and Dumas will always have a larger history class than any two regular historians you could

name. Even a second-rate historical novel may have ample excuse for existence. But a good one—good, that is, merely as a story—though chronology may be at fault and facts inaccurately stated, will probably succeed in making a period live in the imagination when text-books merely give us dry bones.

"So much for the educational aspect; but there is another. An historical study, though in the form of fiction, may have a positive value as a contribution to knowledge. Just as a portrait or a statue by a great imaginative genius lifts a veil or furnishes a lens by which we gaze into the depths of character, and see problems and enigmas suddenly grow clear, so a great work of fiction—Shakespeare's Cleopatra, Mr. Bernard Shaw's Caesar, Mr. Hewlett's Mary Stuart, or certain of the biographical studies catalogued in the following pages which it would be invidious to single out, based on original research, and depicting their characters not merely as statesmen or politicians, but as living people, with personal as well as public interests, with ordinary frailties and workaday inconsistencies—gives the historical student a bird's-eye view where previously his sight has been obstructed by details. * * *.

"The groundwork of the genuine historical romance—melodrama masquerading as historical can be left out of account—is as sincere and valid reconstruction as the best efforts of the serious historian, and much the same methods are employed. Neither can possibly be more than an approximation to the reality; neither can help us to anything but a partial realization of the past which is no more. This, it has been pointed out over and over again, is, in its fullness and vitality, utterly beyond our grasp. We can never put ourselves in the place of an early Victorian, much less of an Elizabethan or a man of the Stone Age. Mental associations are impossible to put off. We should have to cultivate complete amnesia and begin life again, to get more than a faint and rudimentary idea of what our remote ancestors really thought and felt.

"It is worth while noticing that we unconsciously put history and fiction on equal terms when, for example, we compare Scott's Graham of Claverhouse with Macaulay's. * * *.

"Reconstruction of bygone days—people, manners, ways of life, historical

Magnificent Yankee," without the consent of the heirs of Oliver Wendell Holmes and Louis D. Brandeis, would be a misdemeanor; the portrayal on stage or screen in Utah of "The Mudlark," without the consent of the heirs of Queen Victoria and Benjamin Disræli, would be a misdemeanor; the portrayal on stage or screen in Utah of the "Lady With the Lamp," without the consent of the heirs of Florence Nightingale, would be a misdemeanor; the portrayal on stage or screen in Utah of "The House of Rothschild," without the consent of the heirs of the Rothschilds, would be a misdemeanor; the portrayal on stage or screen in Utah of Drinkwater's "Abraham Lincoln," without the consent of the heirs of Abraham Lincoln, would be a misdemeanor, and the portrayal on stage or screen in Utah of Shakespeare's historical plays, without the consent of the heirs of the deceased public figures characterized therein, would be a misdemeanor. To these, many, many other examples could be added.

I cannot believe it was the intention of the Legislature of Utah thus to impede the cultural development of the enlightened and progressive people of that great state.

In 1919, Bernie Babcock wrote a historical novel, "The Soul of Ann Rutledge," depicting the romance of Abraham Lincoln and Ann Rutledge, the untimely death of Miss Rutledge, and the fact that for days thereafter Lincoln was almost beside himself, and setting forth words and acts of Lincoln manifesting his belief in the immortality of the soul. The story also included imaginary characters and interspersed truth with apocryphal matter. The author, in her preface, stated:

"In the tremendous output of Lincolniana that has been given to literature, it seems strange that no adequate story has been given of one of the greatest loves in history.

"Many writers have referred to it and to its moulding power on the lover's after life. Some have thrown sidelights on the character of the woman. Some have mentioned

events—is the main business of a goodly proportion among the later novels enumerated in the following pages. In the finest historical novel of the last thirty

her rare gift of song and her unusual endowment of mind, and one writer has given a careful description of her personal appearance. But so far as careful and exhaustive research shows, all this matter has never been woven into one story. .

"It is also strange that there has been so much controversy regarding the religious views of Abraham Lincoln, * * *.

"*　　*　　*　　*　　*　　*　　*

"In this story both the love and the faith of one of earth's noblest souls is simply and intimately told."

Many students of Lincoln believe that the ordeal Lincoln went through in the loss of his boyhood sweetheart was one of the experiences which steeled and prepared him for the difficult trials that confronted him as chief executive during the trying days of the war between the states. No doubt, many volumes of "The Soul of Ann Rutledge" were sold by the publishers in the State of Utah. Could the heirs of Lincoln have maintained an action against such publishers under the Utah statute? Can it be said that "The Soul of Ann Rutledge," although written in the form of a story, is not informative and educational? I think not.

Of course, motion picture theatres are operated with a profit motive. But, likewise, newspapers and other news disseminating means are operated with a profit motive; biographies of public figures are written, published, and sold with a profit motive; and historical plays, employing deceased public figures as characters, are written and portrayed with a profit motive. But, a profit motive does not take the publication or portrayal of matter which is informative and educational in character and in which the public has a legitimate interest outside the limitations recognized by law on the right of privacy or remove such publication or portrayal from the guaranty of freedom of the press under the Fourteenth Amendment.

years—Tolstoy's War and Peace—the past is portrayed as if it were the present. * * *."

Jack Donahue was a public figure. It is my opinion that either a biographical portrayal of his public career, even though it contained departures from the truth, or a portrayal of the theatrical history of his time, employing Jack Donahue and Marilyn Miller as characters, even though apocryphal in part, would present matter of legitimate public or general interest, and educational and informative in character, and that the portrayal thereof by motion picture would be within the freedom of the press guaranteed by the Fourteenth Amendment and not within the interdiction of the Utah statute.

## II

The damages recoverable for an invasion of the right of privacy are for injury to the feelings.[12] Here, the plaintiffs seek damages for injury to their feelings, which injuries occurred in California. Until such injuries occurred, no cause of action for civil damages arose.

Damages for injuries to the plaintiffs' feelings resulting from the exhibition of the motion picture outside the State of Utah were clearly not recoverable by the heirs of Jack Donahue, since only Utah and Virginia recognize the right of heirs of a deceased person to recover for the invasion of the right of privacy of their ancestor, and the Virginia statute gives such right of action only to heirs who are residents of Virginia.

Two rules have been suggested for determining what law governs in an action for violation of privacy. One is that suggested in Banks v. King Features Syndicate, D.C. N.Y., 30 F.Supp. 352, 354—the law of the place "where the seal of privacy was first broken." Another is suggested in 60 Harvard Law Review, 941, 947–948—the law of the domicile of the complaining party, being the place most intimately connected with such party. I see no good reason for not applying the conventional rule that the law of the place of the wrong governs the right of recovery for injuries to the person. The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place. With respect to injuries to the person it is the place where the harmful force takes effect on the body or the mind.[13] Where the act of omission complained of and the injury occur in different places, the place of wrong, the locus delicti, is the place where the injury sustained was suffered, rather than the place where the act or omission occurred, or, as it is more generally put, it is the place where the last event necessary to make an actor liable for an alleged tort takes place.[14]

The rule has been applied to rights of action created by statute in wrongful death cases. Where the act or omission complained of occurs in one state and the injuries causing death occur in another state, the statute of the latter, rather than that of the former state controls.[15]

If no cause of action is created at the place of wrong, that is, the place where the

12. "The Right of Privacy," 4 Harv.L.Rev. 193, 197; Reed v. Real Detective Pub Co., 63 Ariz. 294, 162 P.2d 133, 139; Melvin v. Reid, 112 Cal.App. 285, 297 P. 91, 93; 41 Am.Jur., Privacy, § 12, p. 934.

13. See Restatement, Conflict of Laws, § 377.

14. Hunter v. Derby Foods, Inc., 2 Cir., 110 F.2d 970; Hickman v. Taylor, D.C. Pa., 75 F.Supp. 528, affirmed, Hickman v. Taylor, 3 Cir., 170 F.2d 327; Kristansen v. Steinfeldt, 165 Misc. 575, 300 N.Y.S. 543, reversed on other grounds, 256 App.Div. 824, 9 N.Y.S.2d 790; Darks v. Scudders-Gale Grocer Co., 146 Mo.App. 246, 130 S.W. 430; Rundell v. La Campagnie Generale Transatlantique, 7 Cir., 100 F. 655, 657; Alabama G. S. R. Co.

v. Carroll, 97 Ala. 126, 11 So. 803, 805, 806; Conklin v. Canadian-Colonial Airways, Inc., 266 N.Y. 244, 194 N.E. 692, 694; Dallas v. Whitney, 118 W.Va. 106, 188 S.E. 766, 767; Connecticut Valley Lumber Co. v. Maine Cent. R. R., 78 N. H. 553, 103 A. 263, 266; Cameron v. Vandegriff, 53 Ark. 381, 13 S.W. 1092, 1093; Otey v. Midland Valley R. Co., 108 Kan. 755, 197 P. 203, 204; Note, 133 A.L.R. 260.

15. Hunter v. Derby Foods, Inc., 2 Cir., 10 F.2d 970, 971, 972; Anderson v. Linton, 7 Cir., 178 F.2d 304, 308, 309; Hickman v. Taylor, D.C.Pa., 75 F.Supp. 528, 533, affirmed 3 Cir., 170 F.2d 327; Kristansen v. Steinfeldt, 165 Misc. 575, 300 N.Y.S. 543, reversed on other grounds, 256 App.Div. 824, 9 N.Y.S.2d 790; Note, 133 A.L.R. 260.

injury occurs, no recovery for tort can be had in any other state.[16]

The conventional rule was applied in Sartin v. Oregon Short Line R. Co., 27 Utah 447, 76 P. 219, and Johnson v. Union Pacific Coal Co., 28 Utah 146, 76 P. 1089, 1091.

In State v. Devot, 66 Utah 319, 242 P. 395, 398, 43 A.L.R. 532, Devot was charged with the offense under a Utah statute of obtaining money by fraud. He sent a false telegram from Los Angeles, California, to C. M. Hammond, at Logan, Utah, signing the name of Joseph Hammond, son of C. M. Hammond, thereto, and requested C. M. Hammond to telegraph $142 to him at Los Angeles. The Utah court held that the telegraph company was the agent of Devot to receive the money and that the wrong was committed in Utah. But, the court made this significant statement: "In light of the law as we have found it, and to facilitate the due and proper administration of justice, we do not hesitate to hold that, if some person in Utah should fraudulently obtain money from a citizen of California by means substantially similar to those employed in the instant case, the case should be tried in California where the injury was done and the consequences of the wrong inflicted."

See, also, Buhler v. Maddison, 109 Utah 267, 176 P.2d 118, 122, 123, 168 A.L.R. 177.

The power of Utah by statute to provide that an act constituting an invasion of the right of privacy, occurring in that state, shall constitute a criminal offense and to fix the · punishment therefor, notwithstanding the injuries to the person resulting from such an act occur in another state, cannot be doubted. Moreover, Utah might provide a civil penalty for such an invasion of the right of privacy, notwithstanding the injuries to the person resulting from such act occur in another state, as a deterrent to the criminal act. In so doing, Utah would deal with the wrongful act and not with a result of such act occurring in another state.

But, the question here presented is whether Utah can by statute create a right of action for injuries suffered by a person in another state on account of a wrongful act occurring in the State of Utah, the force of which reached beyond the territorial limits of Utah and caused the injuries in such other state, where no right of action for such injuries is recognized by the state in which they occurred; and, if Utah can create such a right of action not recognized at common law,[17] whether its Legislature, in enacting the statute above referred to, intended so to do.

Parenthetically, it may be observed that the question is not whether a nonresident of Utah, who suffered injuries to his feelings within the State of Utah, from an invasion of the right of privacy of his ancestor, occurring either in Utah or outside of Utah, could invoke the Utah statute.

It is well settled that the legislative authority of every state must spend its force within the territorial limits of the state, and that a law does not have any effect of its own force beyond the limits of the sovereignty from which its authority is derived.[18]

16. Restatement, Conflict of Laws, § 384; Dawson v. Dawson, 224 Ala. 13, 138 So. 414, 415; Pringle v. Gibson, 135 Me. 297, 195 A. 695, 697; Gray v. Gray, 87 N.H. 82, 174 A. 508, 94 A.L.R. 1404; M. Salimoff & Co. v. Standard Oil Co. of New York, 262 N.Y. 220, 186 N.E. 679, 682; Ewell v. Cardinal, 53 R.I. 469, 167 A. 533, 534; Rauton v. Pullman Co., 183 S. C. 495, 191 S.E. 416, 419; Howard v. Howard, 200 N.C. 574, 158 S.E. 101, 102.

17. The right of heirs to recover for the invasion of the right of privacy of their ancestor.

18. Hilton v. Guyot, 159 U.S. 113, 163, 16 S.Ct. 139, 40 L.Ed. 95; Walbridge v. Robinson, 22 Idaho 236, 125 P. 812, 815; Cooley's Constitutional Limitations, 8th Ed., Vol. 1, p. 248.

In McCullough v. Scott, 182 N.C. 865, 109 S.E. 789, 796, the court said: "The law is unmistakably clear that the Legislature has no power to enact statutes, even though in general words, that can extend in their operation and effect beyond the territory of the sovereignty from which the statute emanates. The legislative authority of every state must spend its force within the territorial limits of

Hence, the presumption is that a statute is intended to be confined in its operation and effect to the territorial limits over which the law maker has general and legitimate power. In Sandberg v. McDonald, 248 U.S. 185, 195, 39 S.Ct. 84, 86, 63 L.Ed. 200, the court said: "Legislation is presumptively territorial and confined to limits over which the law-making power has jurisdiction"; and in Stanley v. Wabash, St. L. & P. Ry. Co., 100 Mo. 435, 13 S.W. 709, 710, 8 L.R.A. 549, the court said: "It will not be intended that this statute was to have any extraterritorial force, since this would be beyond the power of the legislature of this state." [19]

Since the injuries to plaintiffs' feelings occurred in California and they suffered no injury to their feelings in Utah, under the common-law conflict of laws rule, approved by the Supreme Court of Utah in Sartin v. Oregon Short Line R. Co., supra, Johnson v. Union Pacific Coal Co., supra, and State v. Devot, supra, the place of the wrong was in California, and the substantive right of the plaintiffs, as heirs of Jack Donahue, to recover damages for the injuries to their feelings would be determined by the law of California.

It is a well-settled rule of statutory construction that a legislature will be presumed not to have intended to overturn by statute long-established principles of law, unless such intent clearly appears, either by express declaration or by necessary implication.[20] It is further a rule of statutory construction that rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language.[21]

In Carlo v. Okonite-Callender Cable Co., 3 N.J. 253, 69 A.2d 734, 740, the court said: "It is well established, however, that statutes are to be construed with reference to the common law and that a statute which is claimed to impose a duty or establish a right which was not recognized by the common law will be strictly interpreted to avoid such asserted change. To effectuate any change in the common law the legislative intent to do so must be clearly and plainly expressed."

First, it is my conclusion that the State of Utah could not extend the operation and effect of its statute beyond the territorial limits of Utah so as to create a right of action for injuries to the plaintiffs' feelings suffered in the State of California, when no right of action for such injuries exists in California, and, second, that the Legislature of Utah did not intend to undertake to give such statute extraterritorial effect and did not intend, by such statute, to modify the common-law conflict of laws rule so as to create a right of action for a wrong, the place of which was outside the State of Utah.

the state. Cooley's Cons.Lim. p. 154. As a general rule, no law has any effect of its own force beyond the territorial limits of the sovereignty from which its authority is derived. 25 R.C.L. 781; Hilton v. Guyot, 159 U.S. 13, 16 S.Ct. 139, 40 L.Ed. 95."

19. See, also, Walbridge v. Robinson, 22 Idaho 236, 125 P. 812, 815, 43 L.R.A., N.S., 240; American Banana Co. v. United Fruit Co., 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826; United States v. Spelar, 338 U.S. 217, 222, 70 S.Ct. 10, 94 L.Ed. 3; Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L. Ed. 680; E. C. Warner Co. v. W. B. Foshay Co., 8 Cir., 57 F.2d 656, 663.

20. Gould v. Parker, 114 Vt. 186, 42 A.2d 416, 418, 159 A.L.R. 622; Los Angeles County v. Frisbie, 19 Cal.2d 634, 122 P.2d 526, 532; Goodman v. Carroll, 205 Ala. 305, 87 So. 368, 369.; Pritchard Petroleum Co. v. Farmers Co-op. Oil & Sup. Co., 121 Mont. 1, 190 P.2d 55, 62, 63; 50 Am.Jur., Statutes, § 346, pp. 339–342.

21. Martin v. Federal Surety Co., 8 Cir., 58 F.2d 79, 82, 83; Cox v. St. Anthony Bank & T. Co., 41 Idaho 776, 242 P. 785, 786; Nuckolls v. Great Atlantic & Pacific Tea Co., 192 S.C. 156, 5 S.E.2d 862, 864.

While the common-law rule that statutes in derogation of common law must be strictly construed has been abrogated by statute in Utah, Utah Code Ann.1943, § 88-2-2, Utah has held that where a liability not recognized at common law is imposed by statute, such liability will not be extended "further than the clear intendment of the statute imposing it." Niblock v. Salt Lake City, 100 Utah 573, 111 P.2d 800, 802, 804.

Under the law of California, an action may not be maintained by an heir for the invasion of the right of privacy of his ancestor.[22]

For the reasons indicated, I would affirm the judgment below.

22. Metter v. Los Angeles Examiner, 35 Cal.App.2d 304, 95 P.2d 491, 494; Mel-vin v. Reid, 112 Cal.App. 285, 297 P. 91, 93.